# EXHIBIT A

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
DANIEL J. PFEFFERBAUM (248631)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF RHODE ISLAND OFFICE OF THE GENERAL TREASURER ON BEHALF OF THE EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF RHODE ISLAND, on Behalf of Itself and All Others Similarly Situated, ) ) ) ) ) ) | Case No.   3:25-cv-08888<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Plaintiff, ) ) | |
| vs. ) ) | |
| FORTINET, INC., KENNETH XIE, KEITH JENSEN, and CHRISTIANE OHLGART, ) ) ) | |
| Defendants. ) ) | DEMAND FOR JURY TRIAL |

Plaintiff State of Rhode Island Office of the General Treasurer on behalf of the Employees' Retirement System of the State of Rhode Island ("plaintiff"), by and through plaintiff's undersigned attorneys, on behalf of itself and all others similarly situated, alleges the following.  This Complaint is based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters supported by, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls, announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fortinet, Inc. ("Fortinet" or the "Company"), analysts' reports, and media coverage of Fortinet.  Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## BACKGROUND AND SUMMARY OF THE ACTION

1.      This is a securities class action brought on behalf of all persons who purchased or otherwise acquired Fortinet common stock between November 8, 2024 and August 6, 2025, inclusive ("Class Period"), against Fortinet and certain of its current and former directors and officers including Kenneth Xie ("Xie"), the Company's Chief Executive Officer ("CEO"), Keith Jensen ("Jensen"), the Company's Chief Financial Officer ("CFO"), and Christiane Ohlgart ("Ohlgart"), the Company's Chief Accounting Officer ("CAO"), for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.      Fortinet, based in Sunnyvale, California, was founded in 2000 by brothers Kenneth and Michael Xie.  The Company describes itself as a leader in cybersecurity providing a range of hardware and software products to address their customers' network and security needs.  As of December 31, 2024, Fortinet had end-customers located in over 100 countries and included enterprises across a wide variety of market verticals, including financial services, retail, healthcare and operational technology ("OT") market verticals, communication and security service providers, and government organizations.  Fortinet offers products in three broad categories: Secure Networking, Unified Secure Access Service Edge ("SASE"), and AI-Driven Security Operations ("SecOps").

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                  - 1 -

3. Fortinet's flagship product is a hardware networking and security device called the FortiGate, which is a firewall that protects customers' computer systems from outside cybersecurity threats. Fortinet offered a range of FortiGate models for customers of different sizes and demands. All FortiGate models were guaranteed at least five years of continued support after their final date of sale – *i.e.*, if a particular FortiGate model was offered for sale from 2015 to 2020, Fortinet would support that model until at least 2025. When a firewall reached the end of its service life, it would continue to function, but would no longer be supported by the Company and would not receive ongoing updates for the latest threats or features.

4. At the eve of the Class Period, November 7, 2024, the Company began touting an upcoming "forced upgrade" of FortiGate firewalls as a result of five different models all reaching the end of their service life at the same time at the end of 2026. Defendants told investors that this would result in a record upgrade cycle that would drive product revenues above and beyond the Company's historical growth rates as customers would be compelled to purchase the Company's newer firewall offerings to properly ensure their cybersecurity:

> [Jensen:] ***Today, we'd like to add to this commentary by noting that in 2026, a record number of FortiGates will reach the end of their support life cycle, and we expect these customers to start to refresh cycle for these products sometime in 2025***.

5. The market reacted positively to this new information on the first day of the Class Period; the Company's stock price increased from $83.68 per share on November 7, 2024 to $92.04 per share on November 8, 2024 on increased volume of 13.8 million shares traded.

6. Shortly thereafter, on November 18, 2024, the Company held its Analyst Day during which defendants provide further detail on the forced upgrade cycle, stating that one quarter of its firewalls – or nearly 700,000 devices – in use by the Company's customers would reach end of service in 2026. Defendants explained that this forced upgrade would not just drive product revenue but also presented an opportunity to cross-sell and upsell other Fortinet service offerings. The Company provided a graphical representation of the forced upgrade opportunity demonstrating the magnitude of the 2026 refresh as the largest in the Company's history:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -



7. Analysts covering the Company viewed the forced upgrade as a growth driver for 2025 and 2026, noting the impact was not expected to materialize until the second half of 2025. For example, a BTIG analyst report titled "Bullish Commentary on Potential End of Life Refresh" stated:

> *We think this tailwind would begin to materialize in 2H'25 at the earliest*. And we do not think FTNT will factor in much benefit from this cycle into their initial 2025 guidance when they report Q4 in February.

8. On December 11, 2024, defendants gave further details on the 2026 forced upgrade cycle discussed during its Analyst Day the prior month. Defendants quantified the forced upgrade cycle as impacting 650,000 units and driving $400 million-$450 million in additional revenue, and noted that "*we simply have not had this type of a refresh cycle spike previously*":

> As we sat down for the Analyst Day, the 2025 planning session, we were looking at some of our data. . . . What we really saw was something unusual, which is this cohort of refreshes in 2026. . . . *We've done some math on that. We look at the unit count, we provided that number, 650,000 units*.
>
> And then as we converted units to dollars internally in some of our commentary, we took certain haircuts. . . .
>
> *And then we quietly uttered a number of $400 million to $450 million for the 2026 cohort*. I would encourage everybody in the audience to do your own math.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - - 3 -

9.      On February 6, 2025, the Company issued a press release reporting its financial results for 4Q24 and FY24 and held an earnings conference call.  Again, the focus was on the upcoming 2026 forced upgrade cycle, which defendants told investors would build momentum in the 2H25 and 2026 as the end-of-service date was reached on December 31, 2026.  Defendant Jensen stated:

> Before discussing our guidance, I'll offer a few updates on **the record-level firewall upgrade opportunity** that we shared during our November Analyst Day.  In the fourth quarter, we saw early upgrade movement with large enterprises, both on buying plans and actual purchases.  **We expect the momentum to build as we move into the second half of 2025 as we get closer to the 2026 and the service dates**.

10.      On February 21, 2025, the Company published its SEC Form 10-K for 2024, which described the 2026 forced upgrade cycle as driver for the Company "in the coming years":

> As organizations continue to modernize their cybersecurity infrastructure, **we anticipate a significant firewall refresh and upgrade cycle in the coming years**.  Given our platform approach, this refresh presents a strategic opportunity to expand our footprint within existing customer environments.

11.      On March 4, 2025, the Company presented at the Morgan Stanley Technology, Media & Telecom Conference.  Defendant Jensen again emphasized the magnitude of the upcoming 2026 forced upgrade cycle, which he touted as ten times larger than average upgrade cycles for the Company:

> We have an unusually large volume of units that are going end of support in 2026.  **It's roughly 10x more than our average in the prior 10 years**. . . .
>
> So it's really creating the opportunity.

12.      On May 7, 2025, the Company announced its 1Q25 financial results and held an earnings conference call.  Defendant Ohlgart addressed the 2026 forced upgrade cycle in her prepared remarks and again emphasized it as a driver for the Company's 2H25 financial results:

> **Regarding the record firewall upgrade cycle that we've spoken about previously, we continue to expect the firewall upgrade cycle to gain momentum in both purchasing and planning activities in the second half of 2025**.

13.      Analysts noted that the 1Q25 financial results did not reflect significant growth from the 2026 forced upgrade cycle and noted that investors were still waiting for its impact to manifest in the Company's results, which was expected in 2H25:

Good Q1 results offset by uncertainty on level of conservatism in guidance and elevated valuation *as we wait for refresh contribution*. Revenue and billings were relatively in-line with consensus expectations . . . . *As we wait for evidence of a meaningful refresh cycle, which management reiterated we could see in the back half of this year*, we think the stock will remain range bound *as we wait for evidence of a meaningful refresh cycle* that we think is already largely priced in at these levels.

14. Disappointed by the apparent absence of meaningful positive impact from the 2026 forced upgrade cycle, the Company's stock price declined from $106.72 per share on May 7, 2025 to $97.74 per share on May 8, 2025 on elevated volume, but remained artificially inflated.

15. On May 13, 2025, the Company presented at the JPMorgan Global Technology, Media and Communications Conference. Defendant Ohlgart was asked directly whether the Company's 1Q25 results were driven by the 2026 forced upgrade cycle; Ohlgart responded that it was only one of multiple drivers and specifically called out other drivers of growth, including the "COVID cohort" and operational technology ("OT"). Ohlgart made no mention of the rapid progression of the 2026 forced upgrade cycle:

> [Analyst:] *How much do you think the strength there was due to industry-wide demand versus product cycle versus refresh cycle?* . . .
>
> [Ohlgart:] *So I think there are multiple trends that we see and tailwinds*, right? One is our own end-of-support cohort, which forces customers to upgrade and replace their existing firewalls because they go end-of-support at the end of 2026. And that's a forcing function that we've been – that we've started to talk about last year at our Analyst Day. . . .
>
> Then you have another more market-wide trend, which is what I would call the COVID cohort of buying that's going to be three to four years old by the end of '25, '26, and many customers do replace their technology after it has been depreciated. . . .
>
> And then naturally, there's always expansion with more use cases going on. And we see a lot of expansion in segmentation, but also in OT. *And so in this quarter, OT was a very strong use case for us*.

16. On June 3, 2025, the Company presented at the Bank of America Global Technology Conference. Defendant Ohlgart was asked multiple questions seeking clarity on the progress of the 2026 forced upgrade cycle. Ohlgart emphasized the magnitude of the 2026 opportunity, stating that it would be bigger than the following 2027 expected refresh based on its composition. Again, Ohlgart gave no indication of the rapid progression of the 2026 forced upgrade cycle despite the in-line results the prior quarter:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -

[Analyst:] [S]o I asked you this question before I'm going to ask it again because it's important. **When you show the chart, there was a big cohort for 2026 end-of-service**. And there was not much, smaller from a number of products, for 2027. **Does it mean that we're going to have two years of big kind of upgrades**? Or is there a difference between the 2026 cohort and the 2027 cohort?

[Ohlgart:] **Yes, there's a pretty big difference in the two cohorts. The '26 cohort is composed of about, value-wise, 1/3 of large firewalls, 1/3 of midsized firewalls and 1/3 of small firewalls**. The 2027 cohort is the low end of the low end, right? It's pretty much one model that drives all the units up. **And so value-wise, it's not as important**.

17. Each of the statements set forth above during the Company's conference calls, presentation, and SEC filings concerning (i) the size and composition of the 2026 forced upgrade cohort, (ii) the impact of the forced upgrade on the Company's results, and (iii) the status and progress of the 2026 forced upgrade, were materially false and misleading when made because defendants knew or deliberately disregarded and failed to disclose the following:

(a) the number of units subject to a forced upgrade was smaller and comprised of more low-end units than represented to investors;

(b) the age and cost of certain devices in the forced upgrade cohort, some of which were up to 15 years old, would not meaningfully impact current revenues;

(c) defendants lacked necessary data on the end users to assess the impact of the end-of-service event in 2026;

(d) the 2026 forced upgrade cycle had materially progressed during 2H24 and 1H25;

(e) in the absence of customers upgrading as part of the 2026 forced upgrade cycle, the Company's reported product sales would have been flat or negative; and

(f) as a result of the foregoing, the 2026 forced upgrade cycle would not be a meaningful driver of growth for the Company during 2H25 and 2026.

18. Defendants' false and misleading statements caused the Company's stock price to be artificially inflated and trade as high as $114 per share during the Class Period. Defendants and other insiders capitalized on the misrepresentations and omissions to investors by selling Fortinet shares at inflated prices. Defendant Xie sold more than 700,000 shares of Fortinet stock during the Class Period at prices as high as $109 per share, generating proceeds in excess of $70 million –

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 6 -

*including the sale of $15 million of stock on August 4, 2025, just three days before the truth was revealed*. Michael Xie, the brother of defendant Kenneth Xie, and the Company's co-founder, President, and Chief Technology Officer, sold more than 800,000 shares of Fortinet stock during the Class Period at prices as high as $106 per share, generating proceeds in excess of $79 million – *including the sale of $47 million of stock on August 4, 2025, just three days before the truth was revealed*. Defendant Jensen sold more than 119,000 shares of Fortinet stock during the Class Period at prices as high as $114 per share, generating proceeds of $ 11.5 million.

19. On August 6, 2025, the Company provided its 2Q25 results and held an investor conference call. In prepared remarks during the call, defendants revealed that the 2026 forced upgrade cycle was already 40%-50% complete as of the end of 2Q25 – *i.e.*, June 30, 2025. What investors had been led to believe would be a growth driver for the second half of 2025 and 2026 was in fact halfway complete more than a month prior and had already occurred without a material impact on revenues – in fact it appeared to be covering for poor product sales unrelated to the forced upgrade:

> *We estimate that we are approximately 40% to 50% of the way through the 2026 upgrade cycle at the end of the second quarter* based on the remaining active units and service contracts, and we expect continued upgrade activity for the remaining devices over the next six quarters.

20. Confused analysts immediately sought detail on the earnings call. Defendants admitted that they lacked visibility into the lower-end products that were reaching end-of-service and whether those customers would pay for the forced upgrade:

> [Ohlgart:] We have a good handle on the lower end of the firewalls where it's with enterprise customers in retail or other scenarios, OT scenarios, *where it's harder for us to predict. And we can only track registration rates and similar is in the lower end*.

21. Defendant Ohlgart also acknowledged that defendants were aware that their statements had caused investors to have higher expectations for the Company than was accurate, but defended the Company's messaging:

> But yeah, *the expectations by the Street might have been a little bit higher, but we said we are outperforming the market, and it was baked in, right*? So we've been consistent in our messaging here.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - - 7 -

22. Another analyst sought clarity from defendants on the progression of the 2026 forced upgrade cycle and where the Company would be at the end of 2025. The analyst noted that defendants had previously indicated the refresh cycle was only 20% complete (based on unit sales), but just a matter of weeks later, defendants reported it as 40%-50% complete as of the end of 2Q25. Defendants did not provide a straightforward response:

> [Analyst:] [M]aybe for you, 40% to 50% through the upgrade cycle, can you just talk about sort of what that cadence is going to look like this year? I mean ***I think that intra-quarter, we were talking about sort of a 20% type of number*** maybe the real question is, where do we end '25 in terms of the percentage of that of the cohort that we're through?

> [Ohlgart:] Good question. We've – if you look at our updated guidance, you see that we believe there is strength in product for the rest of the year. Where we exactly end is hard to say because – of course, it's not only upgrade refresh product that we are planning to sell. So – but I think we will get through those cycles faster than we expect.

23. Another analyst sought information regarding revenue outside of the 2026 forced upgrade cycle and if those sales were actually covering for declining revenue in non-refresh product sales. In contrast to prior statements touting the highly unusual forced upgrade opportunity, defendant Xie downplayed it as a "small percentage" and admitted that their messaging could be "confusing":

> [Analyst:] Just come back to the comments on the refresh cycle for more time and sorry for belaboring this point. But if I'm understanding this correctly, you've done well in excess of $100 million in refresh activity in the past two or three quarters, ***which would suggest Product revenue, excluding this refresh benefit has been flat to negative in the last couple of quarters***. So can you just help me understand why the underlying firewall demand isn't stronger?

> [Xie:] I would not say it would be negative, it's continue to refresh, ***but because it's such a small percentage of the overall business*** . . . .

> We're not too much content on the refresh. ***It's a very small percentage***. . . .

> ***So that's where we kind of – we do give a much more number measurement, sometimes could be it be confusing***, but I do believe it's the way we try to helping the customer partner to upgrade the new SASE firewall instead of have too big business impact because, like I said, the end of service, that's the product being there 12, 15 years ago. It's a pretty small percentage of our total business.

24. Analysts immediately hammered the Company concerning its belated disclosure that the 2026 forced refresh was already half complete. On August 7, 2025, Morgan Stanley downgraded Fortinet, outlining how the Company's disclosure conflicted with its prior representations:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                - 8 -

Last November, at the Analyst Day, Fortinet outlined that there were 650K units that were going to end of life between '26 / '27. This translated to a $400-450mm opportunity over '25/'26 as part of this refresh, . . . . Intraquarter they noted being about 20% done with this refresh, which was appropriate with the ~ $107mm in product revenue growth Y/Y. However, on the Q2 call, Fortinet noted that the refresh was ~40-50% complete, . . . . ***The company did not have a clear answer for what the disconnect was, but noted once they cleaned up their estimates, there was a smaller opportunity that they had thought (e.g., more boxes were no longer active in 650K installed base and more low-end units at lower ASPs)***.

25. On August 7, 2025, Evercore ISI issued an analyst report proclaiming that the Company "Just Closed The Book On The Bull Case" and describing the disclosure as a significant downward revision that indicated past updates were inaccurate:

The CFO disclosed that 40%-50% of the refresh cycle is already complete, ***a significant revision from the previously stated 20% that was made earlier in 1Q, which we learned was inaccurate***.

26. On August 7, 2025, BofA Global Research issued an analyst report critical of the Company for providing a "poor explanation" for the revelation that the forced upgrade cycle was further along than previously communicated to the market:

After speaking to both the CEO and CFO, we believe the disclosure likely confused investors more than helped them. ***The company admitted it doesn't have a good grasp over the exact refresh numbers and last quarter's figure was likely way more than 20%***. To look at things differently, the product refresh represents solutions sold 15 years ago, and the refresh cannot possibly have such an impact on revenues, given that revenues grew over 30x since.

27. On August 7, 2025, Citi published an analyst report addressing callbacks it had with the CEO and CFO in which it sought further information about the progress of the forced refresh and the reasons behind the unexpected disclosure the prior day:

Last Q's disclosure of 20% refresh having been completed (unit-based) was potentially too low/inaccurate, ***as mgmt realized there was limited visibility into some customer activity in the channel, particularly at the lower end*** (i.e. some refreshes already happened that the company was not aware of), which is now being rectified/better-tracked. . . . It also implies that instead of being wholly treated as an incremental growth number, ***the $400-450M of product revenue opportunity issued at analyst day should have included a run-rated portion due to constant refresh activity***.

28. In response to these stunning disclosures, the Company's stock price plummeted from $96.58 per share on August 6, 2025 to $75.30 per share on August 7, 2025 on a massive increased volume of 47 million shares traded.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -      - 9 -

**JURISDICTION AND VENUE**

29. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

30. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

31. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District. The Company's headquarters are located in this District in Sunnyvale, California.

32. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

33. Plaintiff State of Rhode Island Office of the General Treasurer on behalf of the Employees' Retirement System of the State of Rhode Island, as set forth in the accompanying certification that is incorporated by reference herein, purchased or acquired Fortinet common stock during the Class Period and suffered damages as a result of the conduct alleged herein.

34. Defendant Fortinet, Inc. is headquartered within this District in Sunnyvale, California. Shares of Fortinet stock trade on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "FTNT." During the Class Period, Fortinet, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock. The Company has established and regularly publicizes the availability of a website at www.fortinet.com, on which it maintains an "Investor Relations" section where SEC filings, press releases, conference call recordings, investor presentations, shareholder letters, financial statements

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                     - 10 -

and information, corporate governance policies, descriptions of its business, and other information about the Company is made available to investors.

35. Defendant Kenneth Xie is a founder of Fortinet and at all relevant time Fortinet's Chairman of the Board and CEO. In his capacity as CEO, Xie had the power to authorize or approve publicly disseminated information about the Company, regularly spoke on Fortinet's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, regularly made live presentations at analyst-sponsored investor conferences, regularly participated in interviews with the media concerning Fortinet's financial position, and signed or authorized all of Fortinet's SEC filings.

36. Defendant Keith Jensen was Fortinet's former CFO and retired on May 15, 2025. At all times prior to his retirement, Jensen had the power to authorize or approve publicly disseminated information about the Company, regularly spoke on Fortinet's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, made live presentations at analyst-sponsored investor conferences, and signed or authorized all of Fortinet's SEC filings.

37. Defendant Christiane Ohlgart was at all relevant times Fortinet's CAO; and as of May 15, 2025, Ohlgart also served as the Company's CFO following Jensen's retirement. At all relevant times, Ohlgart had the power to authorize or approve publicly disseminated information about the Company, regularly spoke on Fortinet's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, made live presentations at analyst-sponsored investor conferences, and signed or authorized all of Fortinet's SEC filings.

38. Defendants Xie, Jensen, and Ohlgart are collectively referred to herein as the "Individual Defendants." Fortinet and the Individual Defendants are collectively referred to herein as "defendants."

39. The Individual Defendants, because of their positions within the Company, individually and collectively possessed the power and authority to control the alleged fraudulent conduct as well as the contents of Fortinet's reports to the SEC, press releases, and public presentations to securities analysts, money and portfolio managers, and investors. Each defendant was provided with copies of the Company's reports, press releases, and prepared statements alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -        - 11 -

prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations made were thus materially false and/or misleading.

40. As alleged herein, certain of the Company's SEC filings, press releases, and quarterly reports contained material misrepresentations and omissions when issued. In addition, throughout the Class Period, the Individual Defendants participated in the Company's quarterly and/or annual earnings conference calls wherein they made material misrepresentations, omitted material information, or failed to correct the material misstatements or omissions of others.

## CONTROL PERSONS

41. As officers and/or directors and controlling persons of a publicly held company whose common stock is traded on the NASDAQ and governed by the provisions of the federal securities laws, defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects; not to make material misrepresentations with respect thereto or to omit material facts necessary to make the statements contained therein not misleading; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

42. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -      - 12 -

responsible for the accuracy of the public statements detailed herein, and is, therefore, primarily liable for the representations contained therein.

43. Each of the Individual Defendants acted and/or made the statements detailed herein in his or her capacity as an officer and/or director of Fortinet. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

44. On November 7, 2024, after market-close, the Company issued a press release announcing its 3Q24 quarterly earnings. The Company reported the following quarterly results:

- **Revenue:** Total revenue was $1.51 billion for the third quarter of 2024, an increase of 13.0% compared to $1.33 billion for the same quarter of 2023.

- **Product Revenue:** Product revenue was $473.9 million for the third quarter of 2024, an increase of 1.7% compared to $465.9 million for the same quarter of 2023.

- **Service Revenue:** Service revenue was $1.03 billion for the third quarter of 2024, an increase of 19.1% compared to $868.7 million for the same quarter of 2023.

45. The same day, November 7, 2024, the Company held an earnings conference call, also after market-close. Defendants Xie, Jensen, and Ohlgart, as well as John Whittle ("Whittle"), Fortinet's Chief Operating Officer ("COO"), appeared on behalf of the Company. During the conference call, defendants informed investors of the upcoming forced upgrade in 2026 as a result of a "record number" of firewall units owned by customers reaching the end of their life cycle, which would drive expected product revenues above and beyond normal expectations as those old units were replaced with newer products as customers sought to ensure their cybersecurity:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
- 13 -

[Jensen:] Before discussing our guidance, I'd like to offer a couple of comments on the firewall recovery and *refresh opportunity*.  During last quarter's remarks, we mentioned that the continued improvement in the days of registered FortiGuard contracts indicated the inventory digestion at end users was returning or had returned to normal.

In the third quarter, this metric was stable, further validating our view that the firewall market is recovering.  ***Today, we'd like to add to this commentary by noting that in 2026, a record number of FortiGates will reach the end of their support life cycle, and we expect these customers to start to refresh cycle for these products sometime in 2025***.

46.     On November 8, 2024, the first day of the Class Period, Jefferies issued an analyst report titled "The Elusive Refresh Cycle Finally Appears on the Horizon" focusing on this large forced upgrade as products reached end-of-life in 2026 and noting that it was "likely" that the refresh cycle would begin in the second half of 2025:

> **Product Refresh Cycle (More of an Upgrade).**  *FTNT provided incremental color on its refresh cycle which it expects in 2025 (likely 2H) as a material portion of the firewall base faces end of life (forcing customers to upgrade)*.  Expectations are for this 2026 end of life to be double the size of 2023's (benefited 2022 growth).  Note product grew 40% yoy in 2022.  While we see a product upgrade cycle as a positive catalyst in 2025, 12% yoy cons billings expectations still looms as a high initial bar.  We model approx 10% yoy growth in billings in 2025 (down from 11% yoy prev), which we see as more feasible although it will likely be more back half weighted given the refresh dynamic.

47.     The market reacted positively to this new information, and the Company's stock price increased from $83.68 per share on November 7, 2024 to $92.04 per share on November 8, 2024 on increased volume of 13.8 million shares traded.

48.     On November 18, 2024, the Company held its Analyst Day.  Multiple executives appeared on behalf of the Company, including defendants Xie, Jensen, and Ohlgart.  Among other things, defendants noted investor interest in the upcoming forced upgrade that they described as impacting one quarter of all firewall devices used by the Company's customers.  Defendants also noted that the forced upgrade presented an opportunity to drive revenue through cross-selling and upselling functionality beyond just the old product being replaced:

> [John Whittle – COO:] So refresh cycle will be a topic of interest.  And Keith and Christian will talk about it a little bit later in more detail, but give us the field view, Matt, is there an opportunity not only to sell firewalls but also to sell beyond the firewall.  What do you see about the refresh cycle?
>
> [Matthew Pley – Executive Vice President, America Sales:] ***So we have about a quarter of the population of the devices out there coming up for a refresh***

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 14 -

*here in 2026*.  But what you're really going to see is the customer interest is going to engage much sooner than that.  So you're going to start to see that in early 2025.  There's a number of reasons for that, right?

Of course, the logistics of maintenance windows and those things.  But I also think it's an opportunity for customers to look at the consolidation factor of it all.  How can I consolidate more and then potentially look at where we can take the convergence to it.  *So I think the unique opportunity of this upgrade cycle that we're going to come to is that it's going to be really powerful in the sense of the cross-sell, upsell function for the sales teams to go have the conversation*.

49.     As part of the Analyst Day presentation, the Company provided a graphical representation of the forced upgrade opportunity demonstrating the magnitude of the 2026 refresh as the largest in the Company's history and setting expectations that it would drive revenue growth far in excess of the prior 2023 forced upgrade cycle:



50.     On November 18, 2024, Guggenheim issued an analyst report titled "Investor Day Recap – All About the Refresh" covering the Analyst Day and focusing on the details provided by the Company concerning the 2026 forced upgrade cycle, including the products impacted and the potential for incremental product revenue:

**Color on 2026 Refresh Cycle.**  On the F3Q24 earnings call, Management announced that there will be a refresh cycle that will take place in 2026, but gave little color other than it will be a "record number of FortiGates that will reach the end of their support".  Today we learned that 1/4 of the current install base (11 product

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -

- 15 -

models, just under 700k FortiGate units) will reach end of support by 2026, yielding approximately $400-450M in product revenue. This represents 3% of total consensus revenue over the next two years (management said it could represent 4%). Management was optimistic about the opportunity as they anticipate it will add more product revenue and service upsell and expansion opportunities.

51. On November 18, 2024, BTIG issued an analyst report covering the Company's Analyst Day, noting the details concerning the forced refresh cycle and also noting that the impact was not expected to be seen in the Company's 2025 guidance and would not materialize until 2H25:

**Bullish Commentary on Potential End of Life Refresh.** FTNT management sounded optimistic on the potential for refresh activity related to appliances that reach end of support in 2026 to drive incremental growth. At the event, management highlighted that 25% of active appliances in the installed base are expected to reach end of support in 2026. These appliances skew more towards SMB firewalls and therefore likely represent a lower percentage of the installed base product revenue. At one point during the Q&A portion of the event, management mentioned a product revenue opportunity at $400MM - $450MM in revenue. But later during the session, FTNT's CFO clarified that they were not going to quantify the exact opportunity for investors. If $400 - $450MM is the right number, over two years, the refresh opportunity alone would add about 3.0% - 4.0% to total annual revenue growth and 6.5 - 7.5% to annual billings growth. *We think this tailwind would begin to materialize in 2H'25 at the earliest. And we do not think FTNT will factor in much benefit from this cycle into their initial 2025 guidance when they report Q4 in February*.

52. On November 19, 2024, the Company presented at the Needham Security, Networking, and Communications Conference. Defendants Jensen and Ohlgart, as well as Whittle, appeared on behalf of the Company and stated, among other things:

[Analyst:] I guess let's talk about the big end-of-support asset time line that you guys have coming up. You talked about a record number of 40 gates out in the field. I think over 2 times what you guys saw in '21, '22. How often does this base usually refresh before, during or after the end of life support. *I know you talked about the bulk of these coming up in the second half of '26 and you expect them to refresh some time before that*. But I think refresh cycles have obviously changed dramatically over the past 5 to 10 years. So how do you think about that? And any sort of change in behavior that's contemplated in that sort of thought process versus '21, '22?

\*       \*       \*

[Ohlgart:] So that's a forcing function for a change in general, but this is overlaid by normal refresh cycles because typically, customers depreciate their devices over four to five years and then would replace them anyways because every five years, as you may have seen from Ken's presentation, we introduced new chips. We have more powerful devices. So there's – there are other reasons to upgrade and refresh your hardware.

*We just see in '26, a forcing function with significant still registered devices*. Not all of them are active. Some of them may have been refreshed already

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 16 -

and are just sitting under NEA and under service contracts, ***but we believe that this will give us, as we talked about a benefit to our product revenue growth***. But our runway is already pretty high. So it's not that outsized out anymore that you would expect when you just look at the bar.

[Analyst:] . . . Christiane, yesterday, you talked about, I think, $400 million to $450 million of net new product revenue opportunity over the next couple of years coming from that end-of-life support cohort? I guess, how should investors be thinking about that number and the conservatives embedded in that versus past refreshes?

[Ohlgart:] So I think what is embedded in this number is a certain refresh assumption, right, an average price. And then we have recommended replacement models, and I use the pricing and the average discounting for these replacement models to come up with this number. There is – that's the product side of it. As we said, we've been – in order to grow our service revenue, we need to sell as much services as we sold when these devices in the past plus more, there's the opportunity to upsell into as, SASE specifically, and of course, other products like SecOps or so, as we talked with the customer.

53. On December 10, 2024, Scotiabank issued an analyst report covering its "Fireside Chat" with Jensen and Whittle, in particular noting that the 2026 cohort is "back end loaded":

**Appliance refresh opportunity.** The number of units that will go end of life in 2026 is ~650k units vs an avg of ~50k units in past years . . . 2023 was closer to 300k units, which was a bit of an outlier. Fortinet wants to take the opportunity to get in front of customers and make sure they are aware of the SASE and SecOps portfolio. ***The 2026 cohort is back end loaded in terms of end of support***. Management expects incremental buying activity moving through 2025.

54. On December 11, 2024, the Company appeared at the Barclays Global Technology Conference. Defendants Xie and Jensen appeared on behalf of the Company. During the conference, defendants quantified the forced upgrade cycle as impacting 650,000 units and driving $400 million-$450 million in additional revenue. Defendants noted the Company had never seen this type of "refresh cycle spike" in its history:

[Analyst:] Keith, I think you gave a lot of helpful information around this idea of a firewall upgrade cycle here in 2025 as a result of maybe some end of support in 2026. Rate is another driver, maybe a little bit more of a cyclical driver, but can you just remind us how big that cohort is and how much it could add to sort of incremental product billings over the next year or two?

[Jensen:] Yeah, I'm going to be a little bit shy about talking specifically if I can, in terms of numbers. But throughout time, when we've talked about the fact they have multiple products, and so you don't really see the evidence of a product refresh cycle in our income statement because it's just a series of overlapping product life cycles.

As we sat down for the Analyst Day, the 2025 planning session, we were looking at some of our data and Christiane, again, thank you very much for that.

What we really saw was something unusual, which is this cohort of refreshes in 2026. And more specifically, it's products that we announced in 2021 that we're going to go end of service in 2026. ***We've done some math on that. We look at the unit count, we provided that number, 650,000 units***.

***And then as we converted units to dollars internally in some of our commentary, we took certain haircuts. We look at those units that are no longer pinging home, as I would call, and we excluded those is part of that conversion. We made certain assumptions around how much of that refresh has already started for a variety of reasons and how much churn we have***.

***And then we quietly uttered a number of $400 million to $450 million for the 2026 cohort. I would encourage everybody in the audience to do your own math***. I mean, I think there's a fair amount of assumptions that go into it. But keep in mind also, there's another cohort for 2027 that follows after that.

And also that we're talking here only about product revenue, we're not talking about the run rate for services nor the expansion for these other parts of our business now, these other pillars, whether they're SASE or SecOps solutions.

\* \* \*

And probably the last thing that we did this time, which was new was relates to the refresh.

***And I would not necessarily say that the refresh received a separate line in our 12% number***. Rather, the refresh was more about, does it give us comfortable get it more comfort with the 12% number that we provided. And I think that's really how we viewed it at this stage. And part of that, as you go back to, ***we simply have not had this type of a refresh cycle spike previously***. And again, I think we'd like to be a little bit cautious and play this out a little bit more about how we execute and how we deliver against this opportunity and how the upsells and the cross-sells factor into it.

55. On February 6, 2025, the Company issued a press release reporting its financial results for 4Q24 and FY24. The Company reported the following quarterly results:

- **Revenue:** Total revenue was $1.66 billion for the fourth quarter of 2024, an increase of 17.3% compared to $1.42 billion for the same quarter of 2023.

- **Service Revenue:** Service revenue was $1.09 billion for the fourth quarter of 2024, an increase of 17.2% compared to $927.0 million for the same quarter of 2023.

- **Product Revenue:** Product revenue was $574.0 million for the fourth quarter of 2024, an increase of 17.6% compared to $488.1 million for the same quarter of 2023.

56. On February 6, 2025, the Company held its 4Q24 earnings conference call. Defendants Xie, Jensen, and Ohlgart appeared on behalf of the Company. Defendants emphasized,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - - 18 -

again, that the 2026 forced upgrade cycle was expected to build momentum in the second half of 2025 and into 2026:

> [Jensen:] Before discussing our guidance, ***I'll offer a few updates on the record-level firewall upgrade opportunity that we shared during our November Analyst Day***. In the fourth quarter, we saw early upgrade movement with large enterprises, both on buying plans and actual purchases. ***We expect the momentum to build as we move into the second half of 2025 as we get closer to the 2026 and the service dates***.

>          *         *         *

> [Analyst:] So Keith and Christiane, I wanted to understand a little bit just ahead of the refresh opportunity that's starting in the second half. How should we be thinking about inventory levels in anticipation of that demand?

> And then secondly, maybe to follow on to Brian's earlier question, just the assumptions embedded in the product guidance specifically from the end of service refresh, are you assuming half of that $400 million to $450 million opportunity happens in 2025?

>          *         *         *

> [Ohlgart:] Yes, on the linearity of the product revenue assumptions, while there is definitely a compelling reason to refresh in the second half year because you can only renew for one year, we've seen refresh activity happen already, especially for large customers. And we will try to accelerate the upgrade cycle as much as we can. So we've assumed that there is a more gradual than kind of spiky upgrade part.

57. On February 6, 2025, the Company also announced that on February 4, 2025 Jensen notified the Company of his intention to retire on May 15, 2025. The Company stated that it intended to appoint Ohlgart to serve as CFO upon Jensen's retirement.

58. On February 10, 2025, Susquehanna increased its price target in part based on the expectation of further forced upgrade refreshes in 2H25:

> <u>Starting to see some firewall refreshes, momentum expected to pick up in 2H25</u>. FTNT also shared an update on the firewall refresh opportunity for this year. As a reminder, the company plans to end support for nearly 700k firewall models in 2026 and another ~350k units in 2027, which is expected to drive a sizable refresh cycle for FTNT. Management highlighted it has already begun to see enterprises either planning to or upgrading their firewalls and expects this to pick up this year. In terms of the timing of the refresh more specifically, the company anticipates that momentum for the refreshes will build in 2H, and management remains optimistic about the opportunity. Additionally, the company has created vertical specific go-to-market initiatives aimed at driving upsells and cross-sells to solutions like SASE and SecOps through the refresh cycle.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                 - 19 -

59. On February 21, 2025, the Company issued its SEC Form 10-K for 2024 that described the forced upgrade refresh under the heading "Industry Background," noting that the refresh cycle would impact the Company "in the coming years":

> ***As organizations continue to modernize their cybersecurity infrastructure, we anticipate a significant firewall refresh and upgrade cycle in the coming years***. Given our platform approach, this refresh presents a strategic opportunity to expand our footprint within existing customer environments.

60. On February 23, 2025, Deutsche Bank issued an analyst report noting that this was the first time the Company had added a reference to the upcoming refresh cycle to its SEC Form 10-K:

> A paragraph has been included within the "Industry Background" section stating that they "anticipate a significant firewall refresh and upgrade cycle in the coming years". This is the first time the company has referred to a specific refresh event within their 10-Ks.

> DB take: This addition is not surprising given mgmt.'s recent commentary on an upcoming ***Fortinet specific hardware firewall refresh cycle which has been a departure from past commentary that focused more on broader market dynamics***. Characterization as an "upgrade cycle" is noteworthy and may point to confidence in seeing little impact from any trade-down effect, perhaps as customers demand more powerful boxes in order to run a greater number of subscriptions as they standardize on the Fortinet Security Fabric.

61. On March 4, 2025, the Company presented at the Morgan Stanley Technology, Media & Telecom Conference. Defendants Xie and Jensen appeared on behalf of the Company. Jensen emphasized the size of the 2026 forced upgrade cycle as being ten times the usual upgrade activity and the drivers that would impact the Company through the end-of-service date at the end of 2026:

> [Analyst:] And when it comes to Fortinet in particular, I think one of the things investors are excited about is a product refresh coming up within your firewall base. I think you've talked about an unusually large kind of percentage of that base seeing end of life over the next year or so. Can you talk to us about the magnitude of that opportunity? And does that – is that just a product revenue? Is that just a firewall opportunity? Or does that give you sort of more potential to go in and sell the broader solution. Is that an opportunity for SASE attach, if you will, on a go-forward basis?

> \* \* \*

> [Jensen:] ***We have an unusually large volume of units that are going end of support in 2026. It's roughly 10x more than our average in the prior 10 years***. And as followed in 2027 with another cohort that's about half that size. It's just unusual to see the grouping of that.

> \* \* \*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -     - 20 -

[Jensen:] Yes.  I'm more comfortable talking about units and dollars in this particular context.  But I think that the guidance that we've given to people, the things to consider.  *One is that we know the cohort that we talked about in '26, which is, call it, 650,000 units.  One, 15% of those units are not pinging home anymore.  And so they're probably end of life some place and doing something else perhaps*.

\*   \*   \*

It's simply too many units to take down all at once.  And so while we got some tailwinds, we think, from the fourth quarter on some of our larger firewalls, *we would expect those larger enterprises to continue that purchasing pattern as we get closer and closer to the end of service date [i.e., end of 2026]*.  If you look at the SMBs, it's quite possible that they're more likely to wait until Sunday night to do their homework, shall we say, they may wait until closer and closer to the end of service date before they actually go through that change.  *And that cohort, that sub cohort could be more of a 26 event*.  You probably have another group of customers or some place in between with the service providers, which oftentimes are selling to the SMBs.  But again, they're more sophisticated in their buying behaviors, their security considerations.  And they're more apt to start that planning and purchasing processing process earlier than the SMBs.

62.     On May 7, 2025, the Company issued a press release reporting its financial results for 1Q25.  The Company reported the following quarterly results:

- **Revenue:** Total revenue was $1.54 billion for the first quarter of 2025, an increase of 13.8% compared to $1.35 billion for the same quarter of 2024.

- **Product Revenue:** Product revenue was $459.1 million for the first quarter of 2025, an increase of 12.3% compared to $408.9 million for the same quarter of 2024.

- **Service Revenue:** Service revenue was $1.08 billion for the first quarter of 2025, an increase of 14.4% compared to $944.4 million for the same quarter of 2024.

63.     On May 7, 2025, the Company held its 1Q25 earnings conference call.  Defendants Xie, Jensen, and Ohlgart, as well as Whittle, participated on behalf of the Company.  During the prepared remarks, defendant Ohlgart addressed the 2026 forced upgrade cycle stating that they continued to expect it to gain momentum later in the year:

While our business remains strong and we outperformed on the top line in the first quarter with continued confidence in our ability to execute, we recognize that our customers' investment decisions can be influenced by the broader economic outlook.

As a result, we are maintaining our full year billings and revenue guidance ranges to account for potential top line risks associated with the evolving geopolitical environment. *Regarding the record firewall upgrade cycle that we've spoken about previously, we continue to expect the firewall upgrade cycle to gain momentum in both purchasing and planning activities in the second half of 2025*.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                         - 21 -

64. On May 8, 2025, J. P. Morgan issued an analyst report noting that the 2026 forced upgrade cycle had not materialized into results and noting that investors were still waiting for its impact in the second half of the year:

> Good Q1 results offset by uncertainty on level of conservatism in guidance and elevated valuation *as we wait for refresh contribution*. Revenue and billings were relatively in-line with consensus expectations with better than expected profitability and FCF. . . . The company reiterated full year billings and revenue guidance which we feel is appropriately prudent. The full year outlook for non-GAAP operating margin and earnings was a positive following better than expected profitability this quarter. *As we wait for evidence of a meaningful refresh cycle, which management reiterated we could see in the back half of this year*, we think the stock will remain range bound as we wait for evidence of a meaningful refresh cycle that we think is already largely priced in at these levels.

> \* \* \*

> *Timing of refresh cycle. Management reiterated that it expects the firewall upgrade cycle to gain momentum in both purchasing and planning activities in 2H25*. The company indicated that it saw some upgrade movement this quarter from large enterprises upgrading their firewall infrastructure. New FortiGate products, including the recently announced 700G series, are strategically timed to align with the upgrade wave, with more expected later this year and next year, according to management.

65. Disappointed by the apparent absence of meaningful impact from the 2026 forced upgrade cycle, the Company's stock price declined from $106.72 per share on May 7, 2025 to $97.74 per share on May 8, 2025 on elevated volume, but remained artificially inflated.

66. On May 13, 2025, the Company presented at the JPMorgan Global Technology, Media and Communications Conference. Defendant Ohlgart, as well as Whittle, appeared on behalf of the Company. Defendant Ohlgart was asked directly whether the Company's 1Q25 results were driven by the 2026 forced upgrade cycle; Ohlgart responded that it was only one of multiple drivers and specifically called out other drivers of growth, including the "COVID cohort" and operational technology ("OT"). Ohlgart made no mention of the rapid progression of the 2026 forced upgrade cycle:

> [Analyst:] I wanted to touch on the Q1 results briefly and maybe recap those a little bit, particularly with regard – it seems like results were relatively strong and product-related revenue in particular, seemed as though it was pretty strong. *How much do you think the strength there was due to industry-wide demand versus product cycle versus refresh cycle*? And how do you – what are your expectations for the rest of the year there?

[Ohlgart:] So I think there are multiple trends that we see and tailwinds, right? *One is our own end-of-support cohort, which forces customers to upgrade and replace their existing firewalls because they go end-of-support at the end of 2026. And that's a forcing function that we've been – that we've started to talk about last year at our Analyst Day.* And since then, we've created go-to-market motions that allows us to capitalize on that and sell more services.

Then you have another more market-wide trend, which is what I would call the COVID cohort of buying that's going to be three to four years old by the end of '25, '26, and many customers do replace their technology after it has been depreciated. So I think in two to three years, we will more of that being refreshed. But there is not a forcing function to refresh the firewall because it's still under support. And we'll see that across all the firewall providers.

And then naturally, there's always expansion with more use cases going on. And we see a lot of expansion in segmentation, but also in OT. *And so in this quarter, OT was a very strong use case for us*.

67.     On June 3, 2025, the Company presented at the Bank of America Global Technology Conference. Defendant Ohlgart was asked multiple questions seeking clarity on the progress of the 2026 forced upgrade cycle. Ohlgart emphasized the magnitude of the 2026 opportunity, stating that it would be bigger than the following 2027 expected refresh based on its composition. Again, Ohlgart gave no indication of the rapid progression of the 2026 forced upgrade cycle despite the in-line results the prior quarter:

[Analyst:] [W]e spoke a lot about the refresh cycle of firewalls and end of service and replacement of end of service. So is there a delay in customers' deployment of new firewalls ahead of end of service because of the environment? Do you see any correlation between some economic uncertainty and the timing in which firewall upgrade is happening?

[Ohlgart:] So far, I would say we haven't seen a delay. In Q1, we had good FortiGate growth, right, [15%], which was higher than the overall product revenue growth. In Q4 last year, we saw good growth in the midrange segment. And so there are always different segments that are growing faster.

What gives me confidence is that when we analyze the customers that had end-of-support devices and who purchased in Q1, they all purchased more than their end-of-support devices, right? *So we are able to expand and sell more devices, more services, which is what we actually want and what we promised we would do last year when we announced we have a pretty big cohort*.

[Analyst:] Yes. So you have a big – so I asked you this question before I'm going to ask it again because it's important. *When you show the chart, there was a big cohort for 2026 end-of-service*. And there was not much, smaller from a number of products, for 2027. Does it mean that we're going to have two years of big kind of upgrades? Or is there a difference between the 2026 cohort and the 2027 cohort?

[Ohlgart:] *Yes, there's a pretty big difference in the two cohorts. The '26 cohort is composed of about, value-wise, 1/3 of large firewalls, 1/3 of midsized*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -

- 23 -

*firewalls and 1/3 of small firewalls*.  The 2027 cohort is the low end of the low end, right?  It's pretty much one model that drives all the units up.  And so value-wise, it's not as important.

What we do have and what we expect, and this is why also our targets were set this way, is that we expect from the growth during COVID that in '27, '28, we will have a natural, not necessarily forced, upgrade cycle that customers will go through to the next generation because they've deployed the firewalls they purchased between '21 and '24 for four, five years, which is a natural upgrade cycle.  *2026 is really a forced one, where the technology is so old that it's not going to be supported by us anymore*.

68.     Each of the statements set forth above during the Company's conference calls, presentation, and SEC filings concerning (i) the size and composition of the 2026 forced upgrade cohort, (ii) the impact of the forced upgrade on the Company's results, and (iii) the status and progress of the 2026 forced upgrade, were materially false and misleading when made because defendants knew or deliberately disregarded and failed to disclose the following:

(a)     the number of units subject to a forced upgrade was smaller and comprised of more low-end units than represented to investors;

(b)     the age and cost of certain devices in the forced upgrade cohort, some of which were up to 15 years old, would not meaningfully impact current revenues;

(c)     defendants lacked necessary data on the end users to assess the impact of the end-of-service event in 2026;

(d)     the 2026 forced upgrade cycle had materially progressed during 2H24 and 1H25;

(e)     in the absence of customers upgrading as part of the 2026 forced upgrade cycle, the Company's reported product sales would have been flat or negative; and

(f)     as a result of the foregoing the, the 2026 forced upgrade cycle would not be a meaningful driver of growth for the Company during 2H25 and 2026.

### THE TRUTH IS REVEALED

69.     On August 6, 2025, the Company stunned the market when it provided 2Q25 results. While the top-line financial metrics met guidance, defendants stunned the market by revealing that the forced upgrade cycle was already 40%-50% complete as of June 30, 2025.  What investors had

been led to believe would be a growth driver for the second half of 2025 and 2026 was in fact halfway complete and already occurred without a notable uptick in revenues:

> Before moving on to guidance, I'd like to provide an update on our firewall upgrade cycle and the broader macro environment. During our Analyst Day last November, we shared that approximately 650,000 firewall units will reach end of service by the end of 2026, followed by another cohort of 350,000 low-end units in '27.

> *   *   *

> ***We estimate that we are approximately 40% to 50% of the way through the 2026 upgrade cycle at the end of the second quarter*** based on the remaining active units and service contracts, and we expect continued upgrade activity for the remaining devices over the next six quarters.

70. Analysts immediately sought detail on the earnings call. Defendants admitted that they lacked visibility into the lower-end products that were reaching end-of-service and whether those customers would pay for the forced upgrade. They also admitted that they knew their messaging had misled the market with respect to the Company's outlook:

> [Analyst:] ***I wanted to follow up on your prepared remarks that we are 40% to 50% through the 2026 refresh cohort***. What I wanted to understand is how to think about our growth in true cycles? Because if I can pay a billings growth what you're guiding to this year, it's about similar to what you guided to and what you achieved in 2023? 2025 is a really big or larger than normal refresh cohort. So I want to better understand why are we not seeing more upside in the numbers this year from the refresh cohort?

> *   *   *

> [Ohlgart:] I think we need to look at it by FortiGate model. And the large firewalls that are end of support. We have a really good reporting and handle on because we know where they are. These are always well enterprise customers, right?

> We have a good handle on the lower end of the firewalls where it's with enterprise customers in retail or other scenarios, OT scenarios, ***where it's harder for us to predict. And we can only track registration rates and similar is in the lower end***.

71. Defendant Ohlgart also acknowledged that defendants were aware that their statements had caused investors to have higher expectations for the Company than was accurate, but defended the Company's messaging:

> And there could be some excess capacity from prior years that has been replaced or that is replacing some of the EOS models. We are comfortable with our guidance. But yeah, ***the expectations by the Street might have been a little bit higher, but we said we are outperforming the market, and it was baked in, right? So we've been consistent in our messaging here***.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -

72.     Another analyst sought clarity from defendants on the progression of the forced upgrade cycle and where the Company would be at the end of 2025. The analyst noted that defendants had previously implied the refresh cycle was approximately 20% complete (based on unit sales), but just a matter of weeks later, defendants reported it as 40%-50% complete as of the end of 2Q25. Defendants did not provide a straightforward response:

[Analyst:] Christiane, maybe for you, 40% to 50% through the upgrade cycle, can you just talk about sort of what that cadence is going to look like this year? I mean *I think that intra-quarter, we were talking about sort of a 20% type of number* maybe the real question is, where do we end '25 in terms of the percentage of that of the cohort that we're through?

[Ohlgart:] Good question. We've – if you look at our updated guidance, you see that we believe there is strength in product for the rest of the year. Where we exactly end is hard to say because – of course, it's not only upgrade refresh product that we are planning to sell. So – but I think we will get through those cycles faster than we expect.

73.     Another analyst sought information regarding the revenue driven outside of the forced upgrade cycle and if those sales were actually declining during the prior quarters as the forced upgrade proceeded without investor awareness. In contrast to prior statements touting the highly unusual forced upgrade opportunity, defendant Xie downplayed it as a "small percentage" and admitted that their messaging could be "confusing":

[Analyst:] Just come back to the comments on the refresh cycle for more time and sorry for belaboring this point. But if I'm understanding this correctly, you've done well in excess of $100 million in refresh activity in the past two or three quarters, which would suggest Product revenue, excluding this refresh benefit has been flat to negative in the last couple of quarters. So can you just help me understand why the underlying firewall demand isn't stronger?

[Xie:] I would not say it would be negative, it's continue to refresh, but because it's such a small percentage of the overall business, that's the reason we gave additional like building guidance for the rest of the year on top of what we already overachieved in Q1 and Q2. So that's just keeping – we believe, whether the market and also our solution is much better.

We're not too much content on the refresh. It's a very small percentage. We're just using a will to calculate whether internally or incentive the channel to helping customers to upgrade and especially for the new SASE firewall.

*So that's where we kind of – we do give a much more number measurement, sometimes could be it be confusing,* but I do believe it's the way we try to helping the customer partner to upgrade the new SASE firewall instead of have too big business impact because, like I said, the end of service, that's the product being there 12, 15 years ago. It's a pretty small percentage of our total business.

74.    On August 7, 2025, Morgan Stanley issued an analyst report downgrading Fortinet and outlining how the Company's disclosure conflicted with the prior information provided about the size of the forced upgrade cycle.  Morgan Stanley reported that the Company had "cleaned up" its estimates resulting in a larger number of the 650,000 installed base no longer being active and more low-end units than previously communicated to the market:

> What did we learn about firewall refresh that was different than assumptions? Last November, at the Analyst Day, Fortinet outlined that there were 650K units that were going to end of life between '26 / '27.  This translated to a $400-450mm opportunity over '25/'26 as part of this refresh, which provided runway for double digit CAGR off a $1.9bn product revenue base in '24.  Intraquarter they noted being about 20% done with this refresh, which was appropriate with the ~ $107mm in product revenue growth Y/Y.  However, on the Q2 call, Fortinet noted that the refresh was ~40-50% complete, which even on the low end of previously stated opportunity would imply $160mm Y/Y revenue based on the targets laid out at the Analyst Day (e.g. more than the $107mm incremental Y/Y product growth in the 1H).  ***The company did not have a clear answer for what the disconnect was, but noted once they cleaned up their estimates, there was a smaller opportunity that they had thought (e.g., more boxes were no longer active in 650K installed base and more low-end units at lower ASPs).***  The company notes that they remain optimistic about future product growth, but ***it is clear that the original $400-$450mm estimate of the opportunity, which was the basis of our OW, is too large***.
>
> ***Bottom line, the main story of the Q2 print is the meaningful change in assumptions for the firewall refresh opportunity***.

75.    On August 7, 2025, Evercore ISI issued an analyst report titled "FTNT Just Closed The Book On The Bull Case: Growth Path Beyond CY26 Unclear," stating that prior representations about the progress of the forced upgrade were false:

> ***The CFO disclosed that 40%-50% of the refresh cycle is already complete, a significant revision from the previously stated 20% that was made earlier in 1Q, which we learned was inaccurate***.  Reverse engineering the numbers suggests that non-refresh firewall rev is not growing, further weakening the underlying fundamentals outside of the refresh dynamic.  While the size of the refresh opportunity remains unchanged at $400mn - $450mn, the unit count increased from 580k to 650K.  This implies the refresh began earlier than initially believed, likely sometime in CY24, though mgmt cited limited visibility between the channel and internal tracking as a factor in the delayed recognition/confusion in the data.

76.    On August 7, 2025, BofA Global Research issued an analyst report critical of the Company for providing a "poor explanation" for the revelation that the forced upgrade cycle was further along than previously communicated to the market:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                     - 27 -

**Company provides poor explanation of Firewall drivers**

With the refresh completion ratio up from 20% to 45% sequentially, or $50mn in sequential product growth, investors are concerned that Core Firewall revenues, ex-refresh, mathematically declined. *After speaking to both the CEO and CFO, we believe the disclosure likely confused investors more than helped them. The company admitted it doesn't have a good grasp over the exact refresh numbers and last quarter's figure was likely way more than 20%.* To look at things differently, the product refresh represents solutions sold 15 years ago, and the refresh cannot possibly have such an impact on revenues, given that revenues grew over 30x since. In addition, refresh is part of growth every quarter and the comparison base is therefore not zero, suggesting the incremental impact is lower than perceived. Net net, the glass is also half full, and we expect product revenues to continue and grow at or near 10% post refresh.

77. On August 7, 2025, Citi published an analyst report addressing callbacks it had with the CEO and CFO in which it sought further information about the progress of the forced refresh and the reasons behind the unexpected disclosure the prior day:

Mgmt also indicated potential mis-estimates/inaccuracies (on refresh cadence/total cohort opportunity), which likely gives investors concern on MT/LT run-rate FW growth post refresh cycle.

\* \* \*

**Clarifying refresh progress disclosures; prior % completion telegraphed was likely understated** – Last Q's disclosure of 20% refresh having been completed (unit-based) was potentially too low/inaccurate, as mgmt realized there was limited visibility into some customer activity in the channel, particularly at the lower end (i.e. some refreshes already happened that the company was not aware of), which is now being rectified/better-tracked. This would therefore imply a smaller jump to this Q's ~40-50% of units disclosure (refers to % of the overall cohort, while dollar-based % is not drastically different). It also implies that instead of being wholly treated as an incremental growth number, the $400-450M of product revenue opportunity issued at analyst day should have included a run-rated portion due to constant refresh activity.

78. On August 7, 2025, Wedbush issued an analyst report titled "Softer Refresh Comments Casts a Darker Cloud Over the Name; PT to $100." Wedbush reduced its price target for Fortinet from $120 to $100. Concerning the forced upgrade cycle, it stated:

Raised FY25 Guidance; *Overshadowed by Refresh Cycle Comments*. . . . Despite the solid quarter, commentary on the refresh cycle being 40% to 50% through the 2026 upgrade cycle with the 2027 cycle being at a lower price point weighed down on the performance. *The softer refresh comments into 2026 were a tough pill to swallow and will weigh on shares this morning* although we remain positive on the name through this transition into the next year.

79. On August 7, 2025, Goldman Sachs issued an analyst report noting the Company's limited visibility into the forced upgrade cycle:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                    - 28 -

The lack of upside either means that the business ex. refresh is trending worse, or that the size of the refresh is smaller than originally expected. We believe that the latter is more likely, as *Fortinet noted that they have limited visibility into the low end*, that they may over overestimated the size of the refresh given the end of support (EOS) product SKUs originally introduced 10-15 years ago, and that product revenue tied to refresh may be <10-20% of total product revenue. While this means that we are wrong on our thesis of refresh, it also means that the business may be becoming less cyclical as the cohorts layer in over time.

80. In response to these stunning disclosures, the Company's stock price plummeted from $96.58 per share on August 6, 2025 to $75.30 per share on August 7, 2025 on a massive increased volume of 47 million shares traded.

## INSIDER SELLING

81. The Individual Defendants Xie and Jensen, as well as Michael Xie, the Company's President and Chief Technology Officer, engaged in a massive volume of insider selling during the Class Period capitalizing on the Company's inflated stock price, as shown below:

| Kenneth Xie | | | |
|---|---|---|---|
| Date | Price | Quantity | Proceeds |
| 12-Nov-24 | $99.32 | 400 | $39,728 |
| 12-Nov-24 | $97.91 | 3,731 | $365,302 |
| 12-Nov-24 | $98.65 | 18,807 | $1,855,311 |
| 13-Nov-24 | $99.14 | 5,213 | $516,817 |
| 13-Nov-24 | $100.13 | 7,538 | $754,780 |
| 13-Nov-24 | $98.15 | 10,145 | $995,732 |
| 17-Dec-24 | $99.21 | 800 | $79,368 |
| 17-Dec-24 | $98.46 | 7,700 | $758,142 |
| 17-Dec-24 | $97.57 | 14,416 | $1,406,569 |
| 18-Dec-24 | $98.31 | 400 | $39,324 |
| 18-Dec-24 | $97.59 | 2,911 | $284,084 |
| 18-Dec-24 | $94.44 | 3,552 | $335,451 |
| 18-Dec-24 | $93.53 | 4,621 | $432,202 |
| 18-Dec-24 | $96.33 | 5,300 | $510,549 |
| 18-Dec-24 | $95.58 | 6,144 | $587,244 |
| 14-Jan-25 | $91.90 | 9,711 | $892,441 |
| 14-Jan-25 | $92.53 | 13,302 | $1,230,834 |
| 15-Jan-25 | $93.92 | 700 | $65,744 |
| 15-Jan-25 | $93.30 | 22,344 | $2,084,695 |
| 11-Feb-25 | $109.99 | 100 | $10,999 |
| 11-Feb-25 | $109.30 | 6,243 | $682,360 |
| 11-Feb-25 | $108.54 | 16,357 | $1,775,389 |
| 12-Feb-25 | $105.22 | 3,300 | $347,226 |
| 12-Feb-25 | $107.65 | 3,367 | $362,458 |
| 12-Feb-25 | $106.09 | 7,520 | $797,797 |
| 12-Feb-25 | $107.20 | 8,534 | $914,845 |
| 10-Mar-25 | $98.97 | 8,983 | $889,048 |
| 10-Mar-25 | $98.30 | 23,597 | $2,319,585 |
| 10-Mar-25 | $97.05 | 79,479 | $7,713,437 |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                           - 29 -

| 10-Mar-25 | $96.29 | 93,941 | $9,045,579 |
|---|---|---|---|
| 2-May-25 | $106.24 | 120,952 | $12,849,940 |
| 2-May-25 | $105.64 | 37,536 | $3,965,303 |
| 4-Aug-25 | $97.35 | 4,900 | $477,015 |
| 4-Aug-25 | $98.94 | 24,377 | $2,411,860 |
| 4-Aug-25 | $98.44 | 129,209 | $12,719,334 |
| **TOTAL** | | **706,130** | **$70,516,491** |

**Keith Jensen**

| Date | Price | Quantity | Proceeds |
|---|---|---|---|
| 8-Nov-24 | $86.91 | 3,780 | $328,520 |
| 8-Nov-24 | $85.98 | 13,504 | $1,161,074 |
| 8-Nov-24 | $85.00 | 39,421 | $3,350,785 |
| 19-Nov-24 | $91.32 | 1,600 | $146,112 |
| 19-Nov-24 | $90.53 | 2,650 | $239,905 |
| 26-Nov-24 | $96.45 | 3,591 | $346,352 |
| 26-Nov-24 | $94.97 | 4,076 | $387,098 |
| 26-Nov-24 | $95.65 | 9,983 | $954,874 |
| 19-Feb-25 | $113.57 | 6,436 | $730,937 |
| 19-Feb-25 | $112.43 | 7,200 | $809,496 |
| 19-Feb-25 | $114.37 | 9,864 | $1,128,146 |
| 26-Feb-25 | $110.11 | 855 | $94,144 |
| 26-Feb-25 | $109.44 | 8,142 | $891,060 |
| 26-Feb-25 | $108.84 | 8,663 | $942,881 |
| **TOTAL** | | **119,765** | **$11,511,382** |

**Michael Xie**

| Date | Price | Quantity | Proceeds |
|---|---|---|---|
| 11-Mar-25 | $99.80 | 2,200 | $219,560 |
| 11-Mar-25 | $96.11 | 9,913 | $952,738 |
| 11-Mar-25 | $99.30 | 69,914 | $6,942,460 |
| 11-Mar-25 | $97.34 | 92,915 | $9,044,346 |
| 11-Mar-25 | $98.26 | 151,842 | $14,919,995 |
| 2-May-25 | $105.66 | 766 | $80,936 |
| 2-May-25 | $106.24 | 2,780 | $295,347 |
| 4-Aug-25 | $97.39 | 14,100 | $1,373,199 |
| 4-Aug-25 | $98.93 | 75,273 | $7,446,758 |
| 4-Aug-25 | $98.43 | 387,223 | $38,114,360 |
| **TOTAL** | | **806,926** | **$79,389,699** |

## LOSS CAUSATION AND ECONOMIC LOSS

82. During the Class Period, as detailed herein, defendants made materially false and misleading statements and/or omitted material information concerning Fortinet's forced upgrade cycle, its current and future prospects, and the risks facing the business. These misrepresentations caused Fortinet stock to trade at artificially inflated prices throughout the Class Period, including a

Class Period high of \$114 per share on February 19, 2025.  By artificially inflating Fortinet's stock price, defendants deceived plaintiff and the Class (defined below) causing them to suffer substantial losses, *i.e.*, damages under the federal securities laws, when the truth was revealed.  The damages suffered by plaintiff and other members of the Class was a direct and proximate result of defendants' misrepresentations and omissions that artificially inflated Fortinet's stock price and the subsequent significant stock price declines that occurred when the concealed risks materialized and/or the true state of Fortinet's business was revealed to the market in corrective disclosures.

83.    Defendants' false and misleading statements and omissions were revealed to the market through multiple disclosures of the truth on or around August 6, 2025, which caused Fortinet's stock price to decline as a result.  As discussed above, the disclosure of the truth occurred on or around August 6, 2025 when the Company revealed, among other things, that the 2026 forced upgrade cycle was already 40%-50% complete; that the Company had previously overstated the magnitude of the forced upgrade cycle; and that the Company lacked visibility in the drivers of the forced upgrade cycle.

84.    Fortinet's stock price declined on these disclosures of new and unexpected negative information.  The timing and magnitude of Fortinet's stock price decline negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

85.    The economic loss, *i.e.*, damages suffered by plaintiff and other Class members, was a direct result of defendants' material misrepresentations, which artificially inflated Fortinet's stock price, and the subsequent significant decline in the value of Fortinet stock as the true state of the Company's operations, and the risks it faced, was revealed to the market.

## CLASS ACTION ALLEGATIONS

86.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Fortinet common stock during the Class Period and were damaged thereby as alleged herein (the "Class").  Excluded from the Class are defendants and their immediate families, the officers, directors, and affiliates of

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                      - 31 -

defendants, at all relevant times, and their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

87. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Fortinet stock trades on the NASDAQ and has millions of shares outstanding, owned by thousands of persons.

88. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) whether defendants violated the Exchange Act;

(b) whether statements made by defendants to the investing public omitted and/or misrepresented material facts about Fortinet;

(c) whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether the price of Fortinet stock was artificially inflated; and

(f) the extent of damages sustained by Class members and the appropriate measure of damages.

89. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

90. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

91. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -          - 32 -

## APPLICABILITY OF THE FRAUD-ON–THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

92.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's common stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     plaintiff and other members of the Class purchased Fortinet common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

93.     At all relevant times, the market for Fortinet common stock was efficient for the following reasons, among others:

(a)     as a regulated issuer, Fortinet filed periodic public reports with the SEC; and

(b)     Fortinet regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

94.     Plaintiff will also rely upon the presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

### NO SAFE HARBOR

95.     The "Safe Harbor" warnings accompanying Fortinet's reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports

prepared in accordance with GAAP, including those filed with the SEC on Forms 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

96. Defendants are also liable for any false and misleading forward-looking statements pled because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Fortinet who knew that the forward-looking statement was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made. In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.

97. Fortinet's purported cautionary language is inadequate to insulate defendants' false statements under the statutory safe harbor because each of the disclosures is vague and boilerplate. In multiple instances, the purported risks were referenced as potential or contingent future outcomes when in fact the purported risks warned of had already come to fruition and were negatively impacting the Company.

**COUNT I**

**For Violations of §10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

98. Plaintiff incorporates ¶¶1-97 by reference.

99. During the Class Period, Fortinet and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

100.    Fortinet and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Fortinet stock during the Class Period.

101.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Fortinet stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Fortinet stock and experienced losses when the artificial inflation was released from Fortinet stock as a result of the partial revelations and price declines detailed herein. Plaintiff and the Class would not have purchased Fortinet stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misrepresentations and/or omissions.

102.    By virtue of the foregoing, Fortinet and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

103.    Plaintiff incorporates ¶¶1-102 by reference.

104.    Fortinet and the Individual Defendants acted as controlling persons of Fortinet within the meaning of §20(a) of the Exchange Act.  By reason of their controlling positions with the Company, the Individual Defendants had the power and authority to cause Fortinet to engage in the wrongful conduct complained of herein.  Fortinet controlled the Individual Defendants and all of its

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 35 -

employees. By reason of such conduct, Fortinet and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as a Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and appointing plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable, injunctive, or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 16, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
DANIEL J. PFEFFERBAUM

s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com

Attorneys for Plaintiff

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 

- 36 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

State of Rhode Island Office of the General Treasurer on behalf of the Employees' Retirement System of the State of Rhode Island ("Plaintiff") declares:

1.　Plaintiff has reviewed a complaint and authorized its filing.

2.　Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.　Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.　Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.　Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re The Boeing Company Sec. Litig.*, No. 1:24-cv-00151 (E.D. Va.)
*In re Dick's Sporting Goods, Inc. Sec. Litig.*, No. 2:24-cv-00196 (W.D. Pa.)
*Bender v. Domino's Pizza, Inc.*, No. 2:24-cv-12477 (E.D. Mich.)
*Sandoval v. Charter Communications, Inc.*, No. 1:25-cv-06747 (S.D.N.Y.)

6.　Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of October, 2025.

State of Rhode Island Office of the General Treasurer *on behalf of the Employees' Retirement System of the State of Rhode Island*

By: _____
Eileen Cheng, General Counsel

FORTINET

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 03/12/2025 | 200 | $97.93 |
| 03/12/2025 | 800 | $97.95 |
| 03/31/2025 | 600 | $96.26 |
| 03/31/2025 | 800 | $96.26 |
| 03/31/2025 | 64,500 | $96.36 |
| 06/30/2025 | 100 | $105.72 |
| 06/30/2025 | 2,700 | $105.72 |
| 06/30/2025 | 2,800 | $105.72 |
| 06/30/2025 | 3,000 | $105.69 |
| 06/30/2025 | 10,300 | $105.72 |

| Date<br>Disposed | Amount of<br>Shares Disposed | Price |
|---|---|---|
| 12/26/2024 | 1,700 | $97.29 |
| 03/25/2025 | 1,200 | $102.09 |
| 07/29/2025 | 2,300 | $104.77 |

Prices listed are rounded to two decimal places.

*Opening position of 21,100 shares.