**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Lead Counsel for Lead Plaintiff Union Asset
Management Holding AG and the Class*

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE FORTINET, INC. SECURITIES LITIGATION | Case No. 3:25-cv-08037-AMO |
| | <u>CLASS ACTION</u> |
| | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | DEMAND FOR JURY TRIAL |

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-08037-AMO

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................2

II. PARTIES ..............................................................................................................6

    A. Lead Plaintiff ............................................................................................6

    B. Defendants ................................................................................................7

III. JURISDICTION AND VENUE .............................................................................9

IV. OVERVIEW OF DEFENDANTS' DECEPTION OF INVESTORS ............................................................................................................9

    A. Company Background And Core Operations .............................................9

    B. Defendants Access To Live Data From FortiGates Sold To Customers....................................................................................10

    C. FortiGate Planned Obsolescence And "Refresh" Cycles...................................................................................................11

    D. Fortinet Experiences A Post-COVID Slump In Hardware Sales .............................................................................12

    E. During the Class Period, Defendants Misleadingly Touted The 2025-26 Refresh Cycle As A Significant Growth Driver And Revenue Event .........................................12

    F. Analysts Accepted Defendants' Statements Touting The 2025-26 Refresh.................................................................17

    G. Reports From Former Fortinet Employees Confirm That Defendants Knowingly Misled Investors About The Size, Progress, Cadence, And Composition Of The Refresh .................................................................19

    H. Defendants' Suspicious Insider Sales And Stock-Based Compensation Packages Further Confirm Their Scienter ................................................................................25

    I. The Truth Is Revealed: Defendants Admitted They "Over-Discuss[ed]" The Refresh And Revealed That They Had Misstated Its Size, Scope, And Impact ...................................................................................27

V. DEFENDANTS' POST-CLASS PERIOD ADMISSIONS AND POST CLASS PERIOD EVENTS........................................................31

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ..................................................................32

A.  Defendants' Materially False And Misleading Statements And Omissions Concerning The Size, Pace, And Progress Of Fortinet's 2025-26 Refresh ................................................. 33

B.  Defendants' Materially False And Misleading Statements And Omissions Concerning The Factual Basis For Their Statements Touting The Refresh ................................................. 40

C.  Defendants' Materially False And Misleading Statements And Omissions Concerning Defendants' Marketing Initiatives Related To The Refresh ....................................... 41

D.  Defendants' Materially False And Misleading Statements And Omissions Concerning Expansion Of Sales In The Refresh ................................................. 41

E.  Defendants' Materially False And Misleading Statements And Omissions Concerning The Risks Involved In The Refresh ................................................. 43

F.  Defendants' Materially False And Misleading Statements And Omissions That The Refresh Was Large And Occurring Naturally ................................................. 44

VII.   ADDITIONAL ALLEGATIONS OF SCIENTER ................................................. 45

VIII.  LOSS CAUSATION ................................................. 50

IX.    PRESUMPTION OF RELIANCE ................................................. 53

X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................. 54

XI.    CLASS ACTION ALLEGATIONS ................................................. 55

XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ................................................. 57

XIII.  PRAYER FOR RELIEF ................................................. 65

XIV.   JURY DEMAND ................................................. 65

Court-appointed Lead Plaintiff Union Asset Management Holding AG ("Lead Plaintiff") and the Police and Fire Retirement System of the City of Detroit ("Named Plaintiff," and together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by and through their undersigned counsel, bring this class action on behalf of themselves and all other persons or entities who purchased or otherwise acquired Fortinet, Inc. ("Fortinet," or the "Company") common stock during the period from November 8, 2024 through August 6, 2025, inclusive (the "Class Period") and were damaged thereby (the "Class"). Plaintiffs assert claims against Fortinet and its corporate officers Ken Xie (CEO, Board Chair, and Co-Founder), Michael Xie (CTO, Director, and Co-Founder), Keith Jensen (former CFO), Christiane Ohlgart (current CFO and former Chief Accounting Officer), and Aaron Ovadia (Senior Director of Investor Relations) (collectively, "Defendants") under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1 and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5.

Plaintiffs allege the following based on personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of their undersigned counsel. This investigation included a review and analysis of: (i) Fortinet's public filings with the SEC; (ii) research reports by securities and financial analysts; (iii) records and transcripts of investor conference calls; (iv) publicly available presentations by Fortinet; (v) press releases and media reports; (vi) securities pricing data; (vii) information supplied by former Fortinet employees; (viii) consultations with experts; and (ix) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidence exists that will support the allegations in this complaint and will become available to Plaintiffs only after a reasonable opportunity for discovery.

## I.       INTRODUCTION

1.       This securities class action arises from Defendants' materially false and misleading statements and omissions to investors regarding the financial health and prospects of Fortinet, a cybersecurity company whose principal product is the FortiGate firewall. During the Class Period, to convince investors that the Company was exiting a post-COVID financial slump, Defendants repeatedly touted a purportedly massive hardware upgrade or "refresh cycle" where 650,000 or more FortiGate units were supposed to be upgraded over 2025 and 2026. For example, Defendants told investors that this refresh cycle was "***by far the largest we've seen probably ever***" and would generate "***around $400 million to $450 million in product revenue***." To further cultivate the impression of a return to financial health, Defendants also made specific factual representations about the timing, progress, and impact of the refresh, including that it was only approximately 20% complete in mid-2025 (so substantially more revenue was still to come) and that the Company was in fact expanding its sales footprint as customers refreshed. Defendants' statements helped them portray Fortinet as a Company that was experiencing a much-needed financial turnaround. But Defendants knew throughout the Class Period that the refresh would not result in significant revenue—and that the numbers and other purported facts they used to quantify and bolster the purported impact of the refresh were misleading or omitted material information. Tellingly, at the same time they were touting the refresh as a major turnaround, Defendants were unloading many millions of dollars of their ***own personal*** Company shares at inflated prices through highly suspicious insider trades.

2.       On August 6, 2025, after lining their own pockets with more than $160 million from insider sales, Defendants finally revealed the truth about the illusory impact of Fortinet's 2025-26 refresh cycle. Following months of touting the size, scope, and timing of the refresh, Defendants suddenly performed a complete about-face. They confessed that the refresh would in fact "***not provide much business impact***" at all, represented "***a very small percentage***" of Fortinet's total business, and was already "***40% to 50%***" complete by the end of the second quarter of 2025. Further, in a candid acknowledgement that Defendants had misled investors, Defendant Ken Xie,

Fortinet's CEO, Board Chair, and co-Founder, admitted "we probably [did] a little bit **_over-discuss_** . . . **_this refresh upgrade_**."

3.       The market was stunned. Securities analysts expressed their shock at this alarming reversal, writing for example that Defendants' August 6 disclosures were "**_concerning_**," caused "a **_lack of confidence_**," and even specifically flagging that Defendants' prior statements about the refresh were "**_inaccurate_**" and "**_overstated_**." Defendants' revelations caused the Company's stock price to plummet **_by more than 22%_** on unusually heavy trading volume as investors ran for the hills and tens of millions of shares changed hands. By the end of August 7, 2025, Fortinet's stock price declined by $21.28 per share, erasing billions in shareholder value in a single day. Investors suffered enormous damages. Unlike investors, however, Defendants benefited from their misstatements and omissions. Knowing the refresh was illusory, Defendants took advantage of the temporarily inflated share price by engaging in rampant insider selling. All told, Defendants were able to pocket over $160 million in cash from the sale of their personal Fortinet stock at artificially inflated prices during the Class Period.

4.       Fortinet is a cybersecurity company best known for its FortiGate firewalls, a network security system that monitors and controls incoming and outgoing network traffic. Every few years, the Company's firewalls go through a "refresh cycle" where they approach their end of life and require an upgrade to continue working effectively. During the height of the pandemic (2021-22), the Company enjoyed unprecedented revenue growth as companies worldwide shifted employees to remote work and demand soared for cybersecurity hardware, such as the FortiGate. Then, after a successful refresh in 2022, Fortinet's FortiGate sales declined from their COVID-induced highs as customers digested excess inventory purchased during the pandemic. The Company entered a slump. As FortiGate revenues fell and growth stalled, Defendants were desperate to convince investors that the Company was returning to robust revenue growth.

5.       During the Class Period, to create the perception that Fortinet was leaving its slump behind, Defendants told investors that a massive revenue event in the form of one of the largest refresh cycles ever was happening. Defendants represented that the refresh was "**_by far the largest we've seen probably ever_**" involving more than "**_650,000_**" FortiGate units, would generate

*"around $400 million to $450 million in product revenue"* in 2025 and 2026, and would create strong opportunities to cross-sell additional products and services. Further, Defendants repeatedly touted the progress of the refresh, telling investors for example that it was only "20%" completed as of mid-June 2025, which assured investors that 80% of revenue from the refresh was still to come. They also gave investors purportedly corroborative facts about client purchasing behavior and otherwise emphasized the refresh as a highly material revenue and growth driver.

6.      Defendants' representations were materially misleading and omitted key facts. In truth, Defendants knew that the refresh cycle they touted would never be as lucrative or as massive as they represented. Indeed, Defendants knew throughout the Class Period that the refresh could not possibly be as significant as they claimed, including because—*as they later admitted*—it consisted of "old products" that were a "small percentage" of the Company's hardware business. Defendants also misrepresented the timing and nature of the purported refresh and, as noted, even confessed that they had "*over-discussed*" the opportunity and impact presented by the 2025-26 refresh cycle.

7.      Defendants' belated admissions are corroborated by reports from former Fortinet employees who worked at the Company at the same time as Defendants. These former employees reported that during the Class Period it was well known within the Company that the refresh presented minimal business opportunity. Indeed, sales and growth targets were unchanged from prior years despite the refresh. And, while Defendants boasted of refresh-specific "sales plays," former Fortinet employees in both marketing and communications confirm that such plays did not exist. In other words, while Defendants touted the refresh as a massive revenue event to investors, it was simply business as usual inside Fortinet. Former employees further reported that the Company's internal sales software was populated with refresh opportunities for customers that had already switched providers or disconnected their hardware—so these purported refresh sources were illusory. Former employees even reported questioning the accuracy of Defendants' public statements about the refresh given the lack of any evidence that the refresh would drive incremental sales. Indeed, according to one former Fortinet employee, Fortinet definitely overemphasized and overstated the opportunity from the refresh.

8.      Defendants were highly motivated to misrepresent the refresh, including because they collectively engaged in insider selling to the tune of more than $160 million worth of their own Fortinet stock at inflated prices. Defendants' extensive insider selling included particularly damning sales of more than $60 million worth of Fortinet stock only *two days* before they publicly acknowledged that their much-touted refresh was a mirage. Defendants' compensation packages were also heavily stock based—thereby further incentivizing them to artificially inflate the Company's stock price through misleading statements and omissions.

9.      After the close of trading on August 6, 2025, contradicting their earlier statements about the refresh being only 20% complete, Defendants revealed that Fortinet was already "approximately 40% to 50% of the way through the 2025-26 upgrade cycle at the end of the second quarter [of 2025]." In a series of further shocking admissions, Defendants conceded that, in truth, if all the product available for the refresh upgraded, it would "*still not [provide] much business impact*." Even more, Defendant Xie (CEO, Chair, and co-Founder) admitted that Defendants did "probably a little bit *over-discuss about this refresh-upgrade* [sic]," which they "*never*" viewed as a "top growth driver."

10.     Defendants' disclosures revealed that their prior statements were false and misleading, or omitted material facts, and caused Fortinet's stock price to plummet by more than 22%, from a closing price of $96.58 per share on August 6, 2025, to $75.30 per share at the close on August 7, 2025, based on unusually high trading volume. This precipitous decline erased over $16 billion in shareholder value in a single day, the largest such decline in the Company's history.

11.     The broader market reaction to Defendants' revelation was equally dramatic. Analysts were shocked. For example, a Stephens analyst wrote: "We believe the one word to describe the reaction to the disclosure by Fortinet is *shocking*." Several analysts specifically called Defendants out for making inaccurate statements. For example, Barclays reported that Defendants had admitted that the $400-450 million refresh revenue opportunity "*may have been over-stated*." Bernstein analysts wrote "[p]reviously, the company communicated being 20% into the refresh cycle after Q1, but they *acknowledged that figure was inaccurate*." Oppenheimer did the likewise, explaining that Defendants' August 6 disclosures "*appear[ed] incongruent* with prior ~20%

refresh progress value/volume and new 40-50% value/volume progress comments." Other analysts downgraded their Fortinet recommendations and slashed their price targets for Company shares, including for example Piper Sandler, Scotiabank, Barclays, and J.P. Morgan.

12. Then, in yet another telling move (especially for executives of a public company), Defendants took the position that they would no longer publicly discuss the 2025-26 refresh. For example, Mizuho reported that Fortinet "disappointingly indicated today that it will likely no longer explicitly discuss the End of Support (EOS) opportunity, *as it is not serving as much of a growth driver*," despite management having "spent much time discussing—and importantly quantifying" this opportunity during the Class Period. In other words, after artificially inflating Fortinet's stock price through months of touting the refresh while they personally pocketed tens of millions of dollars from insider sales—Defendants suddenly wanted to pretend that nothing had happened and simply move on.

13. As set forth herein, Defendants made materially false or misleading statements and/or omissions and directly and indirectly engaged in conduct that constitutes a scheme to deceive and defraud investors in violation of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

14. Plaintiffs bring this action to recover the damages suffered by Class members, which were caused by Defendants' materially false and misleading statements, omissions, scheme, and/or acts.

## II.  PARTIES

### A.  Lead Plaintiff

15. Lead Plaintiff Union Asset Management Holding AG is a major German asset manager, insurer, and financial services group with a diversified business model spanning the health, property and casualty, pension and life, and investment management industries. Lead Plaintiff purchased Fortinet common stock at artificially inflated prices during the Class Period as set forth in the certification previously filed with the Court and was damaged thereby. *See* ECF No. 42-2. Lead Plaintiff also purchased Fortinet stock contemporaneous with Defendants' insider sales of Fortinet stock on February 11, 12, 19, and 26, 2025, and on March 10 and 11, 2025.

16.     Named Plaintiff the Police & Fire Retirement System of the City of Detroit provides retirement, disability, and death benefits to uniformed employees of the city of Detroit, Michigan, including police officers and firefighters, through a combination of defined benefit and defined contribution plans administered by a Board of Trustees. As indicated on the certification submitted herewith as Attachment 1, Named Plaintiff purchased Fortinet common stock at artificially inflated prices during the Class Period and was damaged thereby. Named Plaintiff also purchased Fortinet stock contemporaneous with Defendants' insider sales of Fortinet stock on December 17 and 18, 2024.

**B.     Defendants**

17.     Defendant Fortinet is a cyber security company. Its core product is the FortiGate firewall, a network security device that monitors and controls incoming and outgoing network traffic based on predetermined security rules. FortiGates and their attached services are how customers typically enter the Fortinet ecosystem—over 95% of Fortinet's largest customers first purchase firewalls from the Company before expanding their relationship with Fortinet. Fortinet common stock trades on the NASDAQ under the ticker symbol "FTNT."

18.     Defendant Ken Xie is, and at all relevant times was, Fortinet's CEO and Chairman of the Company's Board of Directors. Ken Xie is a co-Founder of Fortinet. During the Class Period, Defendant Ken Xie made the false and misleading statements and omissions identified in ¶¶109, 112, 121, 125-26 and sold $70,516,227 worth of his Fortinet stock at suspicious times and contemporaneous with purchases by Plaintiffs and other Class members.

19.     Defendant Michael Xie is, and at all relevant times was, Fortinet's Chief Technology Officer ("CTO") and a Director on the Company's Board of Directors. Michael Xie is a co-Founder of Fortinet, along with his brother Ken Xie. During the Class Period, Defendant Michael Xie made the false and misleading statements and omissions identified in ¶128 and sold $79,391,833 worth of his Fortinet stock at suspicious times and contemporaneous with purchases by Plaintiffs and other Class members.

20.     Defendant Keith Jensen served as Fortinet's CFO during the Class Period until May 15, 2025, when he retired from the Company. During the Class Period, Defendant Jensen made the

false and misleading statements and omissions identified in ¶¶98, 100, 106, 108-09, 111, 115, 118, 121, 125-26 and sold $11,511,466 worth of his Fortinet stock at suspicious times and contemporaneous with purchases by Plaintiffs and other Class members.

21. Defendant Christiane Ohlgart has served as Fortinet's CFO since May 15, 2025. During the Class Period until May 15, 2025, she served as Fortinet's Chief Accounting Officer. During the Class Period, Defendant Ohlgart made the false and misleading statements and omissions identified in ¶¶96-97, 102, 109, 112, 116, 121-22, 125-26 and sold $132,713 worth of her Fortinet stock at suspicious times and contemporaneous with purchases by Plaintiffs and other Class members.

22. Defendant Aaron Ovadia served as Fortinet's Director of Investor Relations throughout the Class Period. During the Class Period, Defendant Ovadia made the false and misleading statement attributed to him identified in ¶104.

23. Defendants Ken Xie, Michael Xie, Jensen, Ohlgart, and Ovadia are collectively referred to herein as the "Executive Defendants." The Executive Defendants directly participated in the management of Fortinet's operations, had direct supervisory involvement in Fortinet's day-to-day operations, and had the ability to control, and did control, Fortinet's statements to investors and financial reporting. The Executive Defendants possessed the power and authority to control the contents of Fortinet's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Executive Defendants were involved in drafting, reviewing, publishing, disseminating, authorizing, and making the false and misleading statements and omissions alleged herein.

24. Fortinet is liable for the acts of the Executive Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

## III.    JURISDICTION AND VENUE

25.    The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

27.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Fortinet's headquarters is located within this District and Defendants conducted substantial economic activity in the District. As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

28.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## IV.    OVERVIEW OF DEFENDANTS' DECEPTION OF INVESTORS

### A.    Company Background And Core Operations

29.    Fortinet specializes in network firewalls—digital security barriers between a trusted network (like a private home/office network) and untrusted networks (like the public internet). A firewall monitors, filters, and controls incoming and outgoing traffic based on predefined security rules and blocks malicious content, unauthorized access, and cyber threats to protect data and devices. Fortinet has two main revenue streams: (i) product revenue, which includes the sale of FortiGate network firewalls and other secure networking products and (ii) service revenue, which is generated primarily from FortiGuard and other security subscription services and FortiCare technical support services. Product revenue accounts for roughly 30-35% of total revenue and service revenue the remainder. According to Defendants' own published data, during the Class Period, small enterprises made up approximately 21% of Fortinet's customer base,

medium enterprises made up 29%, large enterprises made up 40%, and service providers/managed security service providers made up 11%.

30.    FortiGates launched in 2002 as Fortinet's first and flagship product—and they are the principal driver of client acquisition for the Company. For example, approximately 95% of the Company's larger enterprise customers previously or simultaneously purchased FortiGate firewalls. The Company employs a "land and expand" sales strategy, which starts with the sale of a FortiGate firewall and then focuses on pushing additional subscriptions, products, and services on FortiGate clients. Fortinet's sales strategy thus centers on landing customers with the Company's network security products—*e.g.*, FortiGate firewalls—and then expanding sales by cross-selling the broader Fortinet Security Fabric platform, including SASE (a cloud-based network architecture with comprehensive security functions), AI-driven security, and cloud security. Fortinet claims this approach drives higher customer lifetime value by expanding from initial perimeter defense into unified secure networking.

**B.    Defendants Access To Live Data From FortiGates Sold To Customers**

31.    To stay current with rapidly evolving cyber threats, FortiGates sold to customers receive periodic updates from Fortinet. To do so, the FortiGate devices "ping home" to Fortinet. When a FortiGate device "pings home," it engages in a recurring and technically sophisticated exchange of identifying and operational data with Fortinet's servers—a process that Defendants Ken and Michael Xie have continuously refined over two decades. When Defendants described Fortinet's deployed devices as "pinging home," as Fortinet's own documentation and public disclosures confirm, it referred to the FortiGate unit's regular transmission of encrypted data back to Fortinet's FortiGuard Distribution Servers (FDS), which includes the device's unique serial number, its IP address, its geographic location, and accumulated antivirus, IPS, botnet IP list, and application control statistics, with malware statistics accumulated and transmitted by default every sixty minutes, depending on the software version. These communications between FortiGate devices sold to customers and Fortinet itself serve multiple critical functions: they validate the device's subscription and license status with FortiGuard, they check for firmware updates that can be applied to the FortiGate device, they query FortiGuard servers in real time for web-filtering

URL categorization ratings, they periodically download updated signature databases for IPS, antivirus, and application control, and they transmit telemetry data that Fortinet uses to maintain its and improve its threat intelligence. Using the information provided during these communications with FortiGuard, Defendants knew which devices were online and, by comparing serial numbers with Fortinet records, which of those devices were approaching their End of Support (EoS). From a business perspective, the frequent interactions between Fortinet and its installed base of FortiGates provided Defendants with precise insight into how many of the Company's devices, and which models of those devices and their remaining life spans or "age", are in use at any given time. Thus, Defendants knew throughout the Class Period each unit's status within the refresh cycle or whether a unit was not available/participating in the refresh.

**C.    FortiGate Planned Obsolescence And "Refresh" Cycles**

32.    FortiGates have a limited support life cycle of roughly ten years depending on the model. Towards the end of this cycle, the Company first closes orders for a product ("End of Order Date") and then subsequently ends all support for the product ("End of Support Date," "end of life," or "EoL"). After the final End of Support Date, Fortinet will not sell, manufacture, or improve a product and ceases all support services. In general, the End of Support Date for hardware lands approximately 60 months or 5 years after the End of Order Date. For example, the FortiGate 1000C product entered service in January 2011, reached its End of Order date on January 17, 2017, and reached its End of Support Date on January 17, 2022, approximately 11 years after its introduction. When Fortinet hardware approaches the end of its life cycle, customers need to "refresh" their hardware with newer models.

33.    Periodically, large concentrations of FortiGate models reach end-of-life at the same time and require a refresh. Fortinet calls this a "refresh cycle" and claims that such cycles typically boost Fortinet's product revenue for a time as customers are forced to purchase new hardware. Similarly, Fortinet also claims that its larger clients typically refresh after equipment has been fully depreciated. Under relevant accounting rules, corporations can depreciate assets like FortiGates over 5 to 7 years.

**D.    Fortinet Experiences A Post-COVID Slump In Hardware Sales**

34.    The COVID-19 pandemic was a financial boon for Fortinet. As companies worldwide shifted employees to remote work, it created unprecedented demand for new remote connections to company networks and heightened the need for related cybersecurity hardware, such as the FortiGate. Moreover, during COVID, companies seeking to fill this new demand ordered more products than necessary to offset the impact of supply chain disruptions. As a result, and because Fortinet was not supply constrained (unlike many of its competitors), the Company experienced unprecedented product revenue growth from 2020 through 2022. This boom in demand also led Fortinet announce End of Order dates for many of its sold-out products, such as the popular FortiGate 60E/61E, 100E/101E and many D-series and E-series models, with corresponding End of Support in 2026.

35.    However, in 2023 and 2024, Fortinet's product revenue growth slowed and turned negative as customers who purchased or upgraded Fortinet products during the pandemic did not need new firewalls or could otherwise rely on stockpiled inventory. Specifically, in 2022, 2023, and 2024, Fortinet reported product revenue of $1.78, $1.93, and $1.91 billion, respectively, representing growth rates of 42%, 8.4% and -1% from the prior year, respectively.

36.    Given this rapid decline in product revenue growth—from *42% growth in 2022 to -1% in 2024*—Defendants were desperate for a business turnaround and recovery in the firewall market in 2025.

**E.    During the Class Period, Defendants Misleadingly Touted The 2025-26 Refresh Cycle As A Significant Growth Driver And Revenue Event**

37.    During the Class Period, Defendants made a series of statements touting the size, pace, progress, and financial impact of the 2025-26 refresh. While making these statements, Defendants knew or, at a minimum, recklessly disregarded that the refresh could not yield the benefits touted by Defendants. Indeed, as Defendants later admitted, (1) even if all the product available for the refresh upgraded within "one or two years [it would] *still not [provide] much business impact*," (2) Defendants had "*over-discuss[ed]*" the refresh, (3) the $400-450 million refresh opportunity touted by Defendants' throughout the Class Period "*may have been over-*

*stated*," and (4) Defendants "*never*" viewed the refresh as a significant "growth driver." *See infra* §§ IV.I, V. These admissions are inconsistent with, and exposed as misleading, Defendants' Class Period representations about the refresh.

38.     Defendants' misstatements and omissions during the Class Period are summarized below. The specific misstatements and omissions are then set forth *infra* in paragraphs 94-129.

39.     **Defendants Touted The Size And Progress Of The Refresh**. Throughout the Class Period, Defendants touted the 2025-26 refresh as being the "*largest by far*" in the Company's history. For example, Defendant Jensen represented that "the magnitude" of the 2025-26 refresh was "*much, much larger*" than the 2023 refresh where the Company saw product revenue growth "a little bit over 40%." Jensen also claimed that "the absolute number" of devices in the 2026 refresh was "*by far the largest we've seen probably ever*," more than double or "2x" the 2023 refresh. Jensen further claimed that, unlike prior refreshes that were "dominated by the entry-level firewalls," the 2025-26 refresh stood out as containing "a significant portion" of "mid-range firewalls as well." Investors thus understood that the 2026 refresh was purportedly unprecedented in size and that it was uniquely composed of higher-end (and higher-margin) firewalls, unlike any prior refreshes in Fortinet's history. Indeed, Defendant Jensen described the 2025/26 refresh as a "very unusual and positive situation."

40.     Further, in response to analyst questions about the specific size of the refresh, Defendant Ohlgart claimed that the "net" yield to Fortinet of the 2026 refresh "over the next two years," would be "*$400 million to $450 million in product revenue*." This contribution to Fortinet's product revenues was highly material to investors—more than 20% of Fortinet's $1.93 billion in product revenue in 2023. Indeed, the additional $400 to $450 million, Ohlgart elaborated, "*definitely help[s] product revenue*," and that "*total revenue is probably up 4%*" as a result of the 2025/26 refresh.

41.     Relatedly, as the Class Period progressed, Defendants made specific representations regarding the purported size and progress of the refresh. For example, on November 18, 2024, during the Company's Analyst Day, Defendants provided details to investors to measure the size and composition of the 2025-26 refresh cycle. First, Defendants showed investors a presentation that provided a numerical estimate of the 2026 refresh compared to prior refreshes and as a percentage of the Company's total "install base."



42.     The slide purported to show that the refresh included over "650,000" "retiring" FortiGate units, which was a staggering 25% or "1/4" of all installed FortiGate units, more than doubling the 2023 refresh. Later during the Analyst Day, Defendant Jensen described the refresh as covering approximately 650,000 units and touted the accuracy of Company's estimate of the size of the refresh, which he claimed was based on the "percentage of those [devices that] are still pinging home"—*i.e.*, the frequent and ongoing live data exchanges between Fortinet and its installed base of FortiGates discussed above at § IV.B—meaning that Defendants had purportedly confirmed that those devices were still active and, therefore, would refresh. Defendant Ohlgart also touted the size of the refresh, claiming that it represented "***about a fourth of all the registered devices***" that the Company currently had.

43.     On March 4, 2025, in response to an analyst question about the magnitude of the refresh cycle, Defendant Jensen boasted about the "unusually large volume of units that are going end of support in 2026" that were "***roughly 10x more than our average in the prior 10 years***."

CONSOLIDATED CLASS ACTION COMPLAINT                                                    14
CASE NO. 3:25-cv-08037-AMO

44. Similarly, on May 3, 2025, at the Bank of America Global Technology conference, Defendant Ohlgart again touted the composition of the 2026 refresh cohort, claiming that it was "composed of about, value wise, *one-third of large firewalls, one-third of mid-sized firewalls, and one-third of small firewalls*." Because two thirds of the refresh's value was concentrated in mid-sized and large firewalls, which are placed with the Company's larger clients for whom Fortinet claims it has strong visibility, analysts and investors were again reassured that the benefits of the largest forced refresh in the Company's history would soon materialize.

45. **Defendants Touted The Pace And Timing Of The Refresh**. Throughout the Class Period, Defendants misrepresented the cadence and timing of the refresh to investors.

46. For example, early in the Class Period, on November 18, 2024, Defendants claimed that the refresh would "*start . . . in early 2025*." Then, in early 2025, Defendant Ohlgart acknowledged that the refresh had started and represented that it would "*gain momentum in both purchasing and planning activities in the second half of 2025*." Similarly, Defendant Ken Xie represented that "*most of the customers [are] probably still one year's away*" from refreshing, confirming that a majority of the Company's customers had not yet even started refreshing.

47. Then, on June 17, 2025, a Rosenblatt Securities "Company Update" reported on a meeting regarding the refresh with Fortinet management, including by specifically identifying Defendant Ovadia as the person speaking on behalf of Fortinet. According to this report, during the discussion, Defendant Ovadia informed Rosenblatt that "[t]he firewall refresh cycle is proceeding on track with expectations, *valued at approximately $450M (650K units)*" and that "*[t]o date*" only "*20% of the hardware*" had "*already been refreshed*." These statements were important to investors as they reported that the bulk (*i.e.*, 80%) of the revenue from the refresh was still to come.

48. **Defendants Provided Misleading Facts To Bolster Their Claims**. Defendants also told investors that their financial expectations for the purportedly "massive" refresh were based on current data from devices that were "pinging" home. For example, Defendant Jensen claimed that 85% of devices subject to the 2026 refresh were pinging home, which was "a pretty good indicator that there's life out [there]" especially because Defendants had purportedly taken

"certain haircuts" for units that were "no longer pinging home." Analysts accepted Defendants' claims at face value, noting that Defendants purportedly had clear visibility into the progress of the refresh given their claimed ability to receive device "pings" and "know exactly where they are and when they get retired." Indeed, on February 6, 2025, Defendant Jensen claimed that Fortinet "could *see* that the swapping out of the mid-range products that are being end of life and then taking on new products" was occurring. In other words, Defendants boasted that they purportedly knew the number of active devices "pinging" home at any given time and, thus, could accurately measure the devices that would refresh or were in fact refreshing—and exclude those devices that they also knew were not going to refresh.

49.     Defendants also boasted that the 2025-26 refresh was a purportedly "natural" or organic part of the lifecycle of the relevant cohort of FortiGate units. For example, during the Barclays Global Technology Conference on December 11, 2024, an analyst asked Defendant Michael Xie, "as [a] founder of the business, I mean, you've seen so many refresh cycles. What's different about this refresh cycle just from your perspective?" In response, Defendant Michael Xie stated, "a refresh happens as *naturally* it needs to occur. And then -- but at some point, it happens in the *bulk* [more] than some other times."

50.     **Defendants Boasted That The Refresh Was Expanding Sales**. Separate and apart from the product revenue that the 2026 refresh would contribute, Defendants also touted the refresh as a "billings event" because it provided the opportunity to "sell more attached services," *i.e.*, cross-sell, which was not included in Defendants' $400-$450 million estimate. This created the misleading impression that the Company's refresh guidance represented a conservative revenue contribution floor with significant potential upside.

51.     For instance, on February 6, 2025, Defendant Jensen emphasized that the refresh cycle would benefit the Company as it unfolded through 2026 and further highlighted initiatives the Company was taking to accelerate refresh revenues and to maximize the refresh opportunity. Jensen also confirmed that the $400-$450 million estimate conservatively included only product sales, stating, "we're talking here *only* about product revenue. We're not talking about the run rate for services nor the expansion for these other parts of our business now . . . ." These

misrepresentations helped Defendants portray the $400-450 million in additional refresh revenue as a conservative or low-end figure.

52. Then, as the refresh progressed throughout the Class Period, Defendants claimed that Fortinet was in fact able to *expand* sales when customers refreshed. For example, Defendant Ken Xie stated that Fortinet's customers were "*always*" ordering more from Fortinet to support a "*much bigger*" infrastructure, and not just "replacing their old box" as part of the 2025-26 refresh. Defendant Ohlgart claimed that, based on "what we are seeing so far, the customers that have EOS devices, *the smaller customers are buying more*." Ohlgart also claimed that, in Q1 2025, the customers that refreshed "*all [] purchased more than their end of support devices*" so Defendants were purportedly "able to expand and sell more devices, more services, which is what we actually want and what we promised we would do last year when we announced we have a pretty big cohort." Buttressing these statements, Defendant Jensen added that in addition to end-of-life refreshes, Fortinet's clients "have those 10 plus they're buying for other use cases at the same time. *So the deal sizes are getting bigger*. . . ."

\*                    \*                    \*

53. In sum, throughout the Class Period, Defendants made a series of materially misleading statements and omissions concerning the purported size, progress, and impact of the 2025-26 refresh cycle.

**F.      Analysts Accepted Defendants' Statements Touting The 2025-26 Refresh**

54. Throughout the Class Period, analysts accepted Defendants' representations touting the 2025-26 refresh, including by specifically echoing many of Defendants' specific misstatements and/or upgrading their recommendations and price targets for Fortinet's stock.

55. For example, on November 8, 2024, UBS analysts stated that the Company "is now speaking more explicitly about an expected product refresh cycle that they see showing up in 2025" that is *"2x" the size of the 2023 refresh which helped drive "2022 product billings growth of 42%."* The same day, Barclays analysts reported that "[o]ur FY25 billings growth stays at 12% *as a big base of firewall customers is up for refresh* in FY25 ahead of a FY26 EOL." On November 18, 2024, after Fortinet's Analyst Day conference, Wedbush analysts lauded the Company's

"*highly anticipated product refresh cycle*" and specifically highlighted the 650,000 units that Defendants touted during the Class Period.

56.     Analysts also echoed Defendants' statements throughout the Class Period that the refresh would provide the Company with a huge injection of much-needed revenue. For example, on November 19, 2024, Scotiabank Global Equity Research analysts highlighted Defendants' statements that they expected "$400-450M of additional product revenue in the next 2 years" because of the "1/4 of appliances [that] will reach end of sale in 2026" and that it would "allow Fortinet to reaccelerate growth in 2025." RBC analysts also praised the "record number of FortiGates reaching end of support" and emphasized the facts supplied by Defendants, including that "the number of end of life units in 2026 are *2x* that of 2023 the previous peak and *10x* that of the historical average." On February 6, 2025, Cantor Fitzgerald analysts reported that "*25% of Fortinet's installed base (650,000 devices) will reach end-of-support in 2026*, with customers expected to begin refreshing or upgrading these devices in 1H25, *contributing a ~4–5% boost to revenue*," and that "*momentum [is] expected to build in the second half of 2025*."

57.     Defendants' misleading statements and omissions also caused analysts to raise their price targets for Fortinet. For example:

(i)     On November 8, 2024, Rosenblatt increased its price target for Fortinet to $90 from $85 due to, among other things, Fortinet's "firewall recovery, and refresh [that is] expected to start in 2025 as 2x the number FortiGates will reach end of support life in 2026 (up from 2023)." Further, Wedbush increased its price target to $90 from $78; Barclays raised its price target to $95 from $85; and Susquehanna raised its target to $90 from $70.

(ii)    On November 19, 2024, Rosenblatt raised its price target to $100 from $90, highlighting Defendants' touting of "the firewall refresh." Likewise, Wedbush raised its price target to $105 from $90; Piper Sandler raised its target to $100 from $80, and Evercore ISI raised its price target to $90 from $80.

(iii)   In 2025, analysts continued to raise their price targets in response to Defendants' representations. For example, on February 6, 2025, Piper Sandler raised its price

target to $135 from $120 and Wells Fargo raised its price target to $105 from $85. On February 7, 2025, Rosenblatt raised its target to $125 from $115 and Wedbush raised its price target to $130 from $105. Then, on February 10, 2025, Susquehanna raised its price target to $110 from $90.

**G.    Reports From Former Fortinet Employees Confirm That Defendants Knowingly Misled Investors About The Size, Progress, Cadence, And Composition Of The Refresh**

58.    As detailed below, multiple former Fortinet employees reported that, contrary to Defendants' public statements to investors during the Class Period, the reality within the Company was that the 2025-26 refresh was recognized as not being a material event. In fact, it was just business as usual—and Defendants did not change any sales or growth quotas or implement any refresh-related marketing campaigns. Former employees also stated that they specifically noted that Defendants' public statements touting the refresh conflicted with the reality of how the refresh was regarded and treated inside the Company—namely, as a non-event. Further, these individuals reported that Fortinet's sales tracking system pre-populated customers as refresh opportunities, even if those customers had moved to a competitor. These former employee reports were provided independently by multiple individuals who had direct experience working at Fortinet in different roles, in different locations, and at different times—but their reports are strikingly consistent and, thus, mutually corroborating. *See infra* ¶¶60-71.

59.    The former employee (or "FE") reports are further verified by Defendants' ***own admissions*** at the end of the Class Period. For example, in a series of stunning revelations, Defendants eventually admitted that they had "***over-discuss[ed]***" or overstated the refresh opportunity and revealed facts contradicting their Class Period representations. *See infra* §§ IV.I, V. In addition, Defendants engaged in a series of highly suspicious sales throughout the Class Period, liquidating more than $160 million of their own personal Fortinet stock at prices artificially inflated by their misrepresentations and omissions. Critically, Defendants Michael and Ken Xie sold over $60 million of stock on August 4, 2025, just ***two days*** prior to the truth being revealed. *See infra* § IV.H.

CONSOLIDATED CLASS ACTION COMPLAINT                                                                          19
CASE NO. 3:25-cv-08037-AMO

60.    Former Employee #1 (FE-1)[1] was employed at Fortinet as a Senior Product Communications Manager from March of 2023 to March 2025. In this role, FE-1 was responsible for press releases regarding firewall product announcements and participated in internal Fortinet calls discussing the 2025-26 refresh cycle. Because of her responsibilities relating to firewall product announcements generally, FE-1 asked internally how the numbers for the refresh were calculated, if they were real, and how they would measure success as the refresh progressed. FE-1 said she asked these questions of her fellow communications professionals, people on the marketing team, and analyst relations employees, including VP level employees. According to FE-1 no one could answer any of her questions. In FE-1's opinion, anyone with gray matter between their ears was trying to stay away from the refresh cycle because it felt like a nuclear bomb to FE-1. FE-1 said she did not want to be in the blast radius.

61.    FE-1 reported that no one really knew if anything the Company said was real or true, it was just Michael or Ken Xie wanting to make an announcement and off it went. FE-1 knew this because she was tasked with sending draft press releases to the Xie brothers. FE-1 recounted that both Ken Xie and Michael Xie would say whatever they wanted, and no one else had any power to shape the message or correct them if they were saying things that were untrue. According to FE-1, Fortinet employees could never go to the Xie brothers and say that was not a good idea—rather, when Michael or Ken Xie dictated something, then Fortinet employees had to do it even if they could not verify it. This was typical of how Ken and Michael Xie ran Fortinet. Eventually, FE-1's concerns about firewall announcements got to a point where she asked her boss not to put her name on press releases because she knew something weird was going on. FE-1 further reported that, at Fortinet, there were never any lawyers involved in the process. FE-1 said this was suspicious to her because, at her prior employer, lawyers would vet what was said in press releases or earnings announcements. FE-1 also provided an illustration of who Michael and Ken Xie were, explaining that they once fired a communications person for asking too many questions. That

_____

[1] Former Fortinet employees are referred to herein as "FEs" and all are referenced using feminine pronouns regardless of their actual gender in order to maintain their confidentiality.

person was FE-1's boss. FE-1 elaborated that Fortinet had a profound cultural issue that started at the top. FE-1 reported that the Xie brothers were even both directly involved with marketing—all the direction came from them, at least on anything of consequence. FE-1 further explained that the Xie brothers gave the marching orders for the 2025-26 refresh—and she stated that this was why the statements were so pumped up for the refresh cycle initially but then they eventually dropped off.

62.    FE-1 also recalled Defendant Jensen's statement during Fortinet's February 2025 earnings call (*see infra* ¶118) where he listed refresh initiatives, including that Defendants were purportedly "creating sales plays for each customer segment and key vertical; expanding our account plans for larger enterprises to more specifically target the upgrade and expansion opportunities; and collaborating with our channel partners on SMB opportunities, incentive programs, end user data." FE-1 stated that most of Defendant Jensen's statement was marketing bullsh*t and smoke and mirrors.

63.    Former Fortinet Employee #2 (FE-2) worked in Marketing at Fortinet from February 2018 to February 2026. During the Class Period, FE-2 held the position of Director, Enterprise Field Marketing North America at Fortinet. In this position, FE-2 managed a team of people across the country that held customer events for training and executive engagement (meaning executives of clients). FE-2's team covered all client verticals for Enterprise customers both large and small, except the Federal Government.

64.    FE-2 reported that the refresh was made into a bigger deal on Company earnings calls than it ever was internally. She recounted that inside Fortinet the refresh was basically a non-event—indeed, there were always refreshes, and the 2025-26 refresh was not any different than any other year. For example, FE-2 recalled that Company sales quotas were set the same way they always were, meaning the Company took the previous year's revenue and then added a percentage of growth. In her position, FE-2 was responsible for generating the marketing pipeline to match sales quota, and for each of the last five years sales quota growth was consistent. In other words, according to FE-2, there was no increase in sales quotas because of the refresh. Instead, it was business as usual.

65.    As another example of how the refresh was a non-event internally, FE-2 reported that there were *no* refresh marketing activities done by Fortinet—even though there would have been otherwise, as Fortinet's marketing initiatives were in direct alignment with what Sales is trying to do. FE-2 elaborated that, usually with campaigns, Marketing would provide account intelligence that would help Fortinet understand, for example, that the technical team for this company that is headquartered in Chicago actually resides in Charlotte, for instance, so if they were going to do an upgrade, they should host an event in Charlotte where the tech team is located. But FE-2 reported that never happened with the refresh. FE-2 said that, from her perspective as a leader of Fortinet's U.S. marketing team, they heard that there was this big campaign announced and were specifically asking who is developing it and who is executing it. They were wondering whether there was a call to action and what Fortinet's marketing function should be doing from a U.S. marketing perspective, if they needed to do anything differently, and whether there was even a list of customers who needed to be upgraded. But, according to FE-2, marketing did not support sales to do upgrades in the 2025-26 refresh. The refresh was announced, but it did not change the course of their work. They did not do anything from a marketing perspective. Indeed, FE-2 reported that if Sales felt they needed marketing activity for some sort of list of customers, that would have ended up with FE-2 specifically—but that never happened with the 2025-26 refresh. FE-2 further emphasized that any large sales plays would have come through her group, and there were *none* for this refresh.

66.    FE-2 explained her understanding was that Fortinet customers bought a lot of gear during COVID, and not all of it was necessarily activated. FE-2 elaborated that Fortinet was not supply constrained during COVID, which allowed customers to buy excess product and stockpile it beyond their current needs. So, from a refresh perspective, FE-2 explained that many of those devices may never have been turned on and used—they may have just sat on a shelf and were never activated. FE-2 elaborated that this non-activation problem was so pronounced that Fortinet's marketing group had a team of people that focused on devices that were never activated and developed a campaign called Red Carpet to get those devices activated.

67. Former Fortinet Employee #3 (FE-3) worked as an Enterprise Account Manager at Fortinet from January 2025 to May 2025 and worked on selling hardware and services in Fortinet's Named Enterprise sales segment that targeted businesses generating over $500 million in revenue. FE-3 focused on the Houston, Texas metro area. FE-3 explained that the refresh opportunity was discussed internally at Fortinet, especially on the sales team, and that she had a lot of customers that had product that was going end of support or end of life. However, FE-3 reported that, even though it would have benefitted her, she did not see how the refresh was going to be a huge opportunity for Fortinet because a lot of the relevant customers would simply keep what product they had and buy more support.

68. FE-3 explained that Defendants' public statements during her tenure within the Class Period incorrectly made the refresh sound like a huge opportunity where everyone had a ton in the pipeline. However, according to FE-3, the Company would *prepopulate a bunch of opportunities in Salesforce*, assuming the customer would refresh—even though most of these opportunities did not pan out because there was no reason for the customer to refresh, as they were just not interested in refreshing their equipment. Indeed, according to FE-3, on weekly forecast calls, the other sales reps on her team were talking about basically *zero annual refresh opportunities* coming to fruition during her entire tenure. No one on FE-3's team had a big opportunity that was built out of the refresh. These forecast calls were held every week and led by FE-3's Regional Director.

69. According to FE-3, Fortinet definitely overemphasized and overstated the opportunity from the refresh. For example, FE-3 reported that she had accounts that had already moved away from Fortinet to a competitor—and so were more or less dead—but because that customer still had Fortinet hardware, it was automatically shown as an "opportunity" in Fortinet's internal Salesforce system. FE-3 explained that the system at Fortinet would query your accounts and install base, and would autoload and populate the opportunity, which *directly affected the forecast numbers in Salesforce*. This was true even if the account was not a real opportunity. FE-3 explained, for example, that one of her accounts had already made the decision not to continue with Fortinet—it had basically unplugged and ripped out all the boxes—but it still was technically

an active contract. Despite the ripped-out hardware and the fact that the client had gone with a competitor, the client was listed as an "opportunity" in Salesforce. According to FE-3, anything in Salesforce rolled up to sales leadership, who then used it for forecasts. The issue was not specific to FE-3, who explained that the problem she saw frequently across her sales team was that the Company was putting in unqualified opportunities for this refresh that were simply unsupported.

70.     Former Fortinet Employee #4 (FE-4) was a Named Account Manager who worked at Fortinet from March 2020 to January 2026. FE-4 covered mid-enterprise accounts or mid-tier, meaning customers with annual revenues of $250 million to $1 billion in the Phoenix and Reno region. FE-4 reported that from the get-go, when the Company announced the purportedly big refresh, salespeople knew they probably would not be hitting that number, based on the price difference between the old model and the replacement model.  According to FE-4, she was losing revenue when clients did refresh because the price of the new model was so much less and, with improved technology, customers could get the same throughput they had previously by getting a new, lower end model. FE-4 explained that if a customer has a 600E unit that was end of life, their best option then is the 200G or 300G or even the F models of those, which all had significantly lower prices than the 600E. Thus, FE-4 said customers did go to the lower price points. As to the size of the refresh, FE-4 reported that some of her customers were part of that 2026 refresh cohort according to Salesforce—***but a significant amount of them were ineligible for that refresh***.

71.     Former Fortinet Employee #5 (FE-5) worked at Fortinet as a Director of Sales from March 2018 to March 2025. FE-5 was hired to build and grow the salesforce for Fortinet's Enterprise sales segment in the north central U.S. and act as the leader of that sales team. FE-5 reported being confused about the language Defendants used on earnings calls when talking about a global firewall refresh. Internally, FE-5 was not hearing that they had to go out and refresh all their customers and did not remember any big push or communication to the sales force to get out in front of refreshes. FE-5 further reported that she was close to the person who ran sales for all of North America and, therefore, involved in a lot of those calls. However, according to FE-5, that person ***never talked about that refresh cycle***, which FE-5 said she heard about only during earnings calls.

**H.      Defendants' Suspicious Insider Sales And Stock-Based Compensation Packages Further Confirm Their Scienter**

72.      During the Class Period, Defendants Ken and Michael Xie, Jensen, and Ohlgart took advantage of the artificially inflated price of Fortinet's stock caused by their misstatements and omissions by engaging in highly suspicious sales of their personal Company stock holdings.

73.      While Defendants issued materially false and misleading statements to investors, the Insider Trading Defendants collectively sold 1,634,095 shares of their Fortinet stock at artificially inflated prices as high as $114.37 per share, just 45 cents under Fortinet's all time stock price high of $114.82, for illegal insider trading proceeds in excess of $160 million.

74.      The Insider Trading Defendants sold their shares throughout the Class Period, reaping tens of millions of dollars of proceeds while they engaged in the fraudulent and deceptive acts and scheme summarized in this Complaint.

75.      Moreover, as reflected in the chart below, the Insider Trading Defendants' sales of Fortinet stock during the Class Period were dramatically out of line with their prior trading. Specifically, Ken Xie sold *217 percent* more in Fortinet stock during the Class Period than in the comparable prior period ("PP"); Michael Xie sold a staggering *1,610 percent more*; and Jensen sold *247 percent* more.

| Insider name | CP: 11.8.24 - 8.6.25 | | PP: 2.10.24 - 11.7.24 | | CP vs PP $% Change |
| --- | --- | --- | --- | --- | --- |
| | Shares Sold | Proceeds From Sales | Shares Sold | Proceeds From Sales | |
| Ken Xie | 706,130 | $70,516,227 | 474,198 | $32,451,161 | 217.30% |
| Michael Xie | 806,926 | $79,391,833 | 74,134 | $4,928,774 | 1610.78% |
| Keith Jensen | 119,765 | $11,511,466 | 73,985 | $4,655,722 | 247.25% |
| Christiane Ohlgart | 1,274 | $132,713 | No Reported Sales | | |

76.      The Insider Trading Defendants' stock sales also were made at suspicious times during the Class Period. For example, CEO Ken Xie sold 158,486 shares of his Fortinet stock on August 4, 2025—more than 22 percent of his Class Period sales. Likewise, CTO Michael Xie sold 476,596 shares of his Fortinet stock on August 4, 2025, more than 59 percent of his Class Period sales. These two Defendants' sales occurred only *two days* before Defendants revealed that they had misrepresented the 2025-26 refresh throughout the Class Period and had "never" viewed the

CONSOLIDATED CLASS ACTION COMPLAINT                                              25
CASE NO. 3:25-cv-08037-AMO

refresh as a top growth driver, shocking analysts and investors, and causing a precipitous decline in the price of Fortinet common stock.

77. As further incentive to artificially inflate Fortinet's stock price, Defendants' compensation packages were heavily stock-based, including for example to the tune of over 90% for Defendant Ken Xie (CEO). This made Defendants highly motivated to keep Fortinet's stock price artificially high so they could maximize their incentive awards, including valuable stock options, time-based restricted stock units ("RSUs"), and performance-based restricted stock units ("PSUs"). For example, in 2024:

1) Ken Xie received a total of $11.9 million in stock and option awards, which represented over 90% of the value of his total compensation of $13.1 million and dwarfed his $597,000 base salary.

2) Michael Xie received a total of $5.8 million in stock and option awards, which represented over 89% of the value of his total compensation of $6.5 million and dwarfed his $445,000 base salary.

3) Jensen received a total of $4.7 million in stock and option awards, which represented over 84% of the value of his total compensation of $5.6 million and dwarfed his $506,000 base salary.

78. Further, Defendants Ken Xie, Michael Xie, and Jensen's compensation packages were heavily weighted towards PSUs that depended on Fortinet's stock price performance relative to the S&P 500 ("Total Stockholder Return" or "TSR"). Specifically, as Defendants' false and misleading statements and omissions inflated Fortinet's stock price at the start of the Class Period, the key compensation metric of TSR vaulted into the 96th percentile for 2023 PSU TSR targets, resulting in a 200% multiplier to Defendants' PSU compensation. Under the 2024 PSU TSR target, Fortinet's TSR jumped to the 86th percentile, also resulting in a 200% payout. As a result, Defendants' inflated compensation payouts included thousands of PSUs worth millions of dollars they otherwise would have forfeited but for the alleged fraud.

| | 2023 PSU Tranche 2 Award (200% achievement) | 2024 PSU Tranche 1 Award (200% achievement) | Total PSU Award | Total Value Of PSU Awards[2] |
|---|---|---|---|---|
| Ken Xie | 40,064 | 29,168 | 69,232 | $7,626,916 |
| Michael Xie | 17,684 | 14,350 | 32,034 | $3,524,381 |
| Keith Jensen | 16,466 | 11,690 | 28,156 | $3,097,723 |

79.     Thus, the Executive Defendants were heavily incentivized to temporarily deceive investors in order to inflate Fortinet's stock price, maximize their own executive compensation packages which depended heavily on Fortinet's outperformance relative to the S&P 500, and to then unload their own personal shares of Fortinet stock at inflated prices.

**I.       The Truth Is Revealed: Defendants Admitted They "Over-Discuss[ed]" The Refresh And Revealed That They Had Misstated Its Size, Scope, And Impact**

80.     On August 6, 2025, after market hours, Fortinet released its 2Q25 financial results and held an earnings conference call to discuss the results. During the call, after months of touting the refresh, Defendants admitted that Fortinet could never have achieved the business impact from the refresh that they conditioned investors to believe during the Class Period. For example:

- Defendant Ken Xie admitted that "*we probably a little bit over-discuss about this refresh upgrade [sic].*"

- Xie also stated that the FortiGates up for refresh were from a time when the Company was "probably one-fifth or one-tenth of our current size," meaning that the total number of units eligible for upgrade was inherently limited.[3]

---

[2] Calculated as of February 21, 2025. Defendants received their PSU grants on or about this date according to Fortinet's 2025 proxy.

[3] This statement is inconsistent with Defendants' "650,000 units" misstatement. As Fortinet's business was "5-10 times smaller," it logically follows as a matter of simple mathematics that there were just 260,000 to 520,000 FortiGates across Fortinet's entire install base at that time, rendering necessarily misleading Defendants' claim that the 2026 refresh consisted of 650,000 units.

- Xie further stated that "*we're not counting too much on the refresh*" and that even if all of the FortiGates eligible for refresh were upgraded, it would "*still not much been its impact* [sic]" because it "*is a very small percentage*" of the business.

- Xie further acknowledged that the Company's disclosures surrounding the refresh "*could be a little bit confusing*."

- Ohlgart revealed that: "we are approximately *40% to 50% of the way through the 2026 upgrade cycle* at the end of the second quarter based on the remaining active units and service contracts."

- Ohlgart also admitted that customers had been purchasing less than their previous FortiGates that were up for refresh all along.

- Ohlgart further stated that "there could be some *excess capacity from prior years that has been replaced or that is replacing some of the EOS models*."

81.    In addition, Defendant Ken Xie undermined Defendants' own specific mathematical representations concerning the refresh's size during the Class Period, adding that the refresh involved very old firewalls, sold at a time when Fortinet's business was 5-10 times smaller, meaning that the total number of units eligible for upgrade was inherently limited. Xie also noted that the current refresh was not as successful as the 2023 refresh because the 2023 refresh consisted of products that were only four or five years old. Specifically, he stated:

> Yeah. Also the -- the refresh upgrade of the product throughout next year is the product[s that are] like 12 to 15 years after we introduced the product. *It's not a product like four, five years [old] [during the 2023 refresh]. . . But if you compare [Fortinet now] to like a 10, 12, 15 years ago, the business size probably like current size is probably 5 times, maybe even 10 times larger. So that's where the upgrade refresh, we do see is very different than the [2023 refresh]. It's a much older product.* […] And so like I said, even we have a large number of products, but *that's utilized the business we have like 12, 15 years ago.*

82.    These admissions contradicted and exposed as misleading Defendants' earlier representations that the refresh represented 25% of all installed and pinging home firewalls across the Company's current user base and that "all" customers, both Enterprise and "small," were not just replacing equipment in a like-for-like manner but were instead buying *more*.

83.    Analysts were shocked. For example, Stephens reported:

"Fortinet surprised the Street by disclosing that it estimated that it was *40% to 50% of the way through the 2026 upgrade cohort* based on the remaining active units and service contracts. . . . We believe the one word to describe the reaction to the disclosure by Fortinet is *shocking*. *We didn't expect this, and we don't think anyone else did*. We note that after hours Fortinet shares were down 3% but *when this disclosure was made declines accelerated with the stock down 17% after hours*. What Changed? We expect this to be the top question from investors. . . . In summary, *the key issue and surprise* is that refresh has been a material driver of product revenue growth for the last three to four quarters and we are 40% to 50% through the most significant component of the expected refresh.

84.    Bernstein explicitly called out Defendants for falsely claiming the refresh was only 20% completed in June, reporting that "[p]reviously, the company communicated being 20% into the refresh cycle after Q1, but they *acknowledged that figure was inaccurate*." Oppenheimer likewise called out the inconsistency between Defendants' disclosure and their prior statements, noting that "[m]anagement's messaging for 'not negative' ex-refresh product growth *appears incongruent* with prior ~20% refresh progress value/volume and new 40-50% value/volume progress comments."

85.    Defendants' revelations caused analysts and investors to reassess Fortinet's "big turnaround" and growth prospects. For instance, in a report titled "Have We Reached Peak Refresh?", Scotiabank wrote "OUR TAKE: Negative. […] management commentary about the 2026 refresh cycle being 40-50% completed *has spooked us*. We are wondering if we are at the peak of Fortinet's big network security comeback, especially given management's remarks on the 2027 refresh cohort being uninspiring. This is concerning." Similarly, Wolfe reported that "with 50% of what should have been a 2-year refresh cycle (through FY26) completed by 1H25 and uninspiring SASE ARR traction, *we think investors exit 2Q not only questioning the upside scenario but also management's >12%" growth target*." BTIG noted that, given Defendants' representation about the progress of the refresh, that "*excluding the refresh, product [revenue] would theoretically be down 6% y/y* . . . . [B]ears will argue that product growth should have been much higher if FTNT is already 40% - 50% through the refresh. And it *brings into question the*

*duration of FTNT's current growth rate*." Piper Sandler reported that "this newer and challenged narrative will result in a multi-quarter, show-me situation."

86.    In a report published on August 7, 2025, and based on private callbacks with Defendants, Barclays reported that Defendants had also admitted that the $400-450 million refresh revenue opportunity "*may have been over-stated* . . . ."

87.    Defendants' abrupt and shocking reversals as to the size and progress of the refresh also caused securities analysts to sharply reduce their price targets. For example, Piper Sandler downgraded the Company from Overweight to Neutral and slashed its target from $135 to $90. CFRA downgraded the Company from Buy to Hold and cut its target from $108 to $84, citing concerns that customers may be choosing alternative security capabilities or reducing appliance needs. Scotiabank lowered its target from $115 to $85; Barclays from $110 to $90; Truist Securities from $125 to $95; Baird from $110 to $90; J.P. Morgan from $105 to $87. Bernstein cut its target from $94 to $79, and Susquehanna from $110 to $80.

88.    As a result of this news, Fortinet's common stock price collapsed by more than 22%, from a closing price of $96.58 per share on August 6, 2025 to close at $75.30 per share on August 7, 2025, on unusually high trading volume as tens of millions of Fortinet shares changed hands as investors ran for cover.



## V.    DEFENDANTS' POST-CLASS PERIOD ADMISSIONS AND POST CLASS PERIOD EVENTS

89.    Even after the Class Period, Defendants continued to confirm that their Class Period statements were materially false and misleading and/or omitted material information necessary to make them not misleading. For instance, in a fireside chat and apology tour on August 25, 2025, Defendant Ken Xie was asked "is it possible that parts of the firewall refresh cycle are being driven by customers realizing that they had too many boxes, essentially customers realizing that they actually need fewer firewalls and the end-of-support process highlighted that fact?" Xie responded: "So, if you look kind of firewall function alone, *that[] may be the case.*" Xie's response was inconsistent with his Class Period representation that "we do see the -- customer so far we work with always kind of come back with much bigger planned infrastructure to upgrade than the previous, just replacing the old box." During the same conference, Defendant Ken Xie also admitted that the 2026 refresh cohort had been *artificially* manufactured by Defendants' decision during COVID to prematurely declare end of service for many sold out devices: "suddenly because no inventory anymore, we say, okay, let's just announce end-of-service."

90.    On September 11, 2025, at the Goldman Sachs "Communacopia + Technology Conference," an analyst asked whether Defendants had "[a]ny updated thoughts . . . on how that end-of-support cycle is tracking and whether it is moving the business as meaningfully as you would have liked?" In response, Defendant Ken Xie stated, "that refresh or end of service, *[is] never a top growth driver*" and that Defendants themselves "*never consider [the refresh] as kind of the top growth driver*." Confirming this understanding, Defendant Ken Xie listed the Company's top growth drivers and explicitly noted that "I did not mention *anything* come from . . . end of service."

91.    Even months later, analysts continued to press Defendants with questions about the 2025-26 refresh and future refreshes to try to understand why Defendants had contradicted themselves. For example, on November 5, 2025, during the Company's 3Q25 earnings call, an analyst asked Defendants to "just one more time just clarify for us why the 2026 end-of-service cohort was not a contributor for this quarter." Defendants Xie and Ohlgart evaded the question,

instead vaguely expressing their "confiden[ce] with our growth of product over the next few years, the upgrade activity, as Ken said, is a portion of our growth drivers, but *it has different reasons*."

92.    In another telling move, Defendants publicly took the position that they would no longer publicly discuss the 2025-26 refresh, conceding that it was not much of a growth driver. Specifically, Defendant Ken Xie, in response to yet another question about the refresh, admitted that "*I don't think it's the end of a service, it's much of a growth driver there*. And, that's also we probably will stop tracking that." Reporting on the announcement, Mizuho relayed that Fortinet "disappointingly indicated today that it will likely no longer explicitly discuss the End of Support (EOS) opportunity, *as it is not serving as much of a growth driver*," despite management having "spent much time discussing—and importantly quantifying" this opportunity at the November 2024 Analyst Day.

93.    Securities analysts continued to raise concerns about the confusion generated by Defendants' about-face on the 2025-26 refresh and the impact on Defendants' credibility. For example, in a January 2, 2026 report, Guggenheim Securities highlighted the "*ongoing confusion*" and "*unclear communication*" around [Fortinet's] growth opportunities, further explaining that Defendants had "placed a *significant emphasis on [the refresh]*, calling out an incremental $400-450M benefit to Product revenue," which was irreconcilable with their post-Class Period statements "that *the 2026 end-of-life cohort was not a material driver of growth* in the quarter." As a result, William Blair reported on February 2, 2026, that Defendants were now in "a show-me situation" as they "*work[] to rebuild credibility with investors*." Needham & Co. similarly remarked on March 24, 2026, more than 7 months after the Class Period, that Defendants were *still* working to "*re-establish[] credibility*."

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

94.    As detailed below, Defendants made false and misleading statements and omissions during the Class Period. For purposes of compliance with the Court's scheduling order (ECF No. 66) expressing preference for brevity in pleading misstatements and omissions and to avoid block

quotes, the specific misleading portions of the misstatements and omissions at issue are set forth below.

### A. Defendants' Materially False And Misleading Statements And Omissions Concerning The Size, Pace, And Progress Of Fortinet's 2025-26 Refresh

95. During the Class Period, Defendants repeatedly told investors that they could expect between $400 and $450 million in additional revenue from the refresh cycle over the course of 2025 and 2026, a 4% boost to the Company's total revenues.

96. On November 18, 2024, during Fortinet's Analyst Day conference, Defendant Ohlgart stated that "[t]he yield [of the 2025-26 refresh] is probably around net to Fortinet over the next two years, around *$400 million to $450 million in product revenue*," and that "over two years [it] is definitely helping product revenue," with "[t]otal revenue . . . probably *up 4% or some odd percent*."

97. On November 19, 2024, during the Needham Virtual Infrastructure, Data Analytics Software & Cloud Communications Conference, Defendants confirmed the $400-450 million revenue figure. That day, analyst Matt Dezort questioned Defendants about the $400-$450 million revenue figure, asking, "yesterday you talked about, I think *$400 million to $450 million of net new product revenue opportunity over the next couple of years* coming from that end-of-life support cohort. I guess, how should investors be thinking about that number and the conservatism embedded in that versus past refreshes?" In response, Defendant Ohlgart stated, "[s]o, I think *that what is embedded in this number* is a certain refresh assumption, right, an average price. And then, we have recommended replacement models, and I use the pricing and the average discounting for these replacement models to come up with this number . . . [T]hat's the product side of it."

98. On December 11, 2024, during the Barclays Global Technology Conference, Defendant Jensen reiterated the "*number of $400 million to $450 million for the 2026 cohort*."

99. The statements set forth above in ¶¶96-98 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. Defendants'

statements about the revenue that they could generate from the 2026 refresh cohort were materially false and misleading statements and omissions because, in reality, Defendants knew all along that the refresh would not provide anywhere near the $400 to $450 million in revenue that they touted to investors. As set forth herein, former employees reported it was well known throughout the Company that there were no meaningful refresh sale opportunities and that many customers whose units were identified as being up for refresh were either illusory opportunities, not purchasing new firewalls, or were spending less by downgrading their FortiGate units. Further, Defendant Ken Xie later admitted that *"[e]ven [if] all this product"* available for the refresh upgraded *"**within like one or two years** [it would] **still not** [provide] **much business impact**."* Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

100.    During the Class Period, Defendants repeatedly touted to investors that the 2025-26 refresh cohort consisted of 650,000 or more FortiGate units.

1) On November 18, 2024, at Fortinet's Analyst Day conference, Defendants published a presentation containing a slide (the slide is reproduced in full *supra* at ¶41) indicating that the refresh would consist of over ***650,000 "retiring FortiGate Units"*** or ***"1/4 of install base."***

2) Also on November 18, 2024, Defendant Jensen stated, "[y]ou can take the units that are up there [on the slide], ***call it 650,000 units***."

3) On December 11, 2024, during the Barclays Global Technology Conference, Defendant Jensen stated that the 2026 refresh cohort is "***650,000 units***."

4) On March 4, 2025, during the Morgan Stanley Technology, Media & Telecom Conference, Defendant Jensen stated that the 2026 refresh cohort is "***650,000 units***."

101.    The statements set forth above in ¶100 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. Defendants'

statements that the 2025-26 refresh cohort consisted of 650,000 units or more were false and misleading. As reported by former employees, in reality, Fortinet's sales data systems quantifying the refresh were auto populated with, and consisted of, sham refresh opportunities and many customers whose units were identified as being up for refresh were either not purchasing new firewalls or were spending less by downgrading their FortiGate units. As a result, Defendants knew that they would not be able to upgrade anywhere near "650,000 units." Indeed, Defendant Ken Xie admitted that the FortiGates up for refresh were from a time when the Company was "probably one-fifth or one-tenth of our current size," which is inconsistent with Defendants' 650,000 claim, and that "*[e]ven [if] all this product*" available for the refresh upgraded *within like one or two years [it would] **still not** [provide] **much business impact**.*" Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

102. On November 18, 2024, during Fortinet's Analyst Day conference, Defendant Ohlgart emphasized the purportedly massive size of the refresh, stating "to put it into perspective[,] *[t]he 2026 cohort is about <u>a fourth</u> of all the registered devices, FortiGate devices that we currently have*," and that it is "such a steep increase" because "it's 11 models and these were high volume models."

103. The statements set forth above in ¶102 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. Defendants' statements that the 2025-26 refresh cohort consisted of "about a fourth of all registered devices" were false and misleading. As reported by former employees, in reality, Fortinet's sales data systems quantifying the refresh were auto populated with, and consisted of, sham refresh opportunities and many customers whose units were identified as being up for refresh were either not purchasing new firewalls or were spending less by downgrading their FortiGate units. As a result, Defendants knew that they would not be able to upgrade anywhere near one fourth of the registered units. Indeed, Defendant Ken Xie admitted that the FortiGates up for refresh were from a time when the Company was "probably one-fifth or one-tenth of our current size," which is

inconsistent with Defendants' claim that the refresh opportunity consisted of 650,000 FortiGates and that *"[e]ven [if] all this product"* available for the refresh upgraded *"**within like one or two years** [it would] **still not** [provide] **much business impact**."* Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

104.    On or about June 17, 2025, as relayed by a Rosenblatt Securities analyst and attributed to Defendant Ovadia, "[t]he firewall refresh cycle is proceeding on track with expectations, ***valued at approximately $450M (650K units)***" and that "***[t]o date***" only "***20% of the hardware***" had "***already been refreshed***."

105.    The statements set forth above in ¶104 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein, Defendants' statements about the number of units involved in the 2025-26 refresh and the percentage progress of the refresh were materially false and misleading statements and omissions because Defendants knew all along that (i) the refresh would not provide anywhere near the $400 to $450 million in new revenue that they touted to investors, (ii) customers were either consolidating and downgrading their firewall units or not purchasing new units at all, and (iii) Defendants knew they were already much further through the refresh cycle than 20%. As set forth herein, former employees reported that within Fortinet it was known all along that there were no meaningful refresh sale opportunities and because customers were either not purchasing new firewalls or were spending less by downgrading their FortiGate units. Indeed, Defendant Ken Xie admitted that "*[e]ven [if] all this product*" available for the refresh upgraded "***within like one or two years** [it would] **still not** [provide] **much business impact**.*" And shortly after these statements were made, Defendant Ohlgart admitted that in truth the Company was already 40-50% through the refresh. Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

106.    On March 4, 2024, at a Morgan Stanley conference, Defendant Jensen continued to tout the purported size of the 2025-2026 refresh cohort to investors. In response to a question about

the magnitude of the refresh, Defendant Jensen stated that "*[w]e have an unusually large volume of units that are going end of support in 2026[,] [i]t's roughly 10 times more than our average in the prior 10 years*."

107.    The statements set forth above in ¶106 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. Jensen's statement that the 2025-26 refresh was an "unusually large volume of units that are going end of support in 2026 [and] [i]t's roughly 10 times more than our average in the prior 10 years" was false and misleading. As reported by former employees, in reality, Fortinet's sales data systems quantifying the refresh were auto populated with, and consisted of, sham refresh opportunities and customers were either not purchasing new firewalls or were spending less by downgrading their FortiGate units. As a result, Defendants knew that the refresh would not involve 10 times more units than the prior 10 year average. Indeed, Defendant Ken Xie admitted that the FortiGates up for refresh were from a time when the Company was "probably one-fifth or one-tenth of our current size," which is inconsistent with Defendants' claim that the refresh opportunity consisted of 650,000 FortiGates and that "*[e]ven [if] all this product*" available for the refresh upgraded *"within like one or two years* [it would] *still not* [provide] *much business impact*." Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

108.    On November 7, 2024, during Fortinet's 3Q 2024 earnings call, Defendant Jensen repeatedly emphasized the purportedly massive size of the refresh stating:

  1) "the absolute number that we see in 2026 is *by far the largest we've seen probably ever, but certainly in the last five or six years.* It is -- each year is dominated by the entry-level firewalls. However, in 2026, we do see a significant portion of that actually being in the mid-range firewalls as well, and that is *a very unusual and positive situation*."

2)    "in 2026, *a record number of FortiGates* will reach the end of their support life cycle, and *we expect these customers to start to refresh cycle for these products sometime in 2025*."

3)    "*the magnitude in 2026 is much, much larger*" than 2023.

4)    "I would say the second – *2023 was – 2022 was the second best – second highest I looked at. 2026 is a little bit more than 2 times 2023*."

109.    On February 21, 2025, Fortinet filed its Annual Report for 2024 on Form 10-K with the SEC, which was signed by Defendants Ken Xie, Jensen, and Ohlgart. Defendants' 10-K stated, "As organizations continue to modernize their cybersecurity infrastructure, we anticipate *a significant firewall refresh and upgrade cycle* in the coming years."

110.    The statements set forth above in ¶¶108-09 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein, Defendants' statements about the "record" size of the refresh that "is by far the largest we've seen" and "is a huge opportunity" were false and misleading because, in reality, Defendants knew all along that the old devices up for refresh made up only a negligible part of the Company's business and that customers were not purchasing replacement firewalls at a rate that would allow Defendants to capitalize on the refresh. As a result, Defendants knew that they would not be able to upgrade anywhere near 650,000 FortiGate units and that "the 2026 refresh cohort" was not "about a fourth of all registered devices." As set forth herein, former employees reported that there were no meaningful refresh sale opportunities and that customers were either not purchasing new firewalls or were spending less by downgrading their FortiGate units. Indeed, Defendant Ken Xie admitted that the FortiGates up for refresh were from a time when the Company was "probably one-fifth or one-tenth of our current size," which is inconsistent with Defendants' claim that the refresh opportunity consisted of 650,000 FortiGates and that "*[e]ven [if] all this product*" available for the refresh upgraded "*within like one or two years [it would] still not [provide] much business*

*impact*." Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

111. On February 6, 2025, during Fortinet's fourth quarter (4Q) 2024 earnings call, Defendant Jensen cited the purchasing activity that Defendants were *already* seeing to assure investors that the refresh cycle was set to continue into the second half of 2025 and through 2026. Specifically, Jensen stated, "[i]n the fourth quarter [of 2024], *we saw an early upgrade movement with large enterprises, both on buying plans and actual purchases*[,] [w]e *expect the momentum to build as we move into the second half of 2025 as we get closer to the 2026 [end of] service dates*."

112. On May 7, 2025, during Fortinet's first quarter (1Q) 2025 earnings call, Defendants represented to investors that the benefits from the 2025-2026 refresh were still ahead.

1) Defendant Ohlgart stated, "*[r]egarding the record firewall upgrade* cycle that we've spoken about previously, we continue to expect the firewall upgrade to *gain momentum in both purchasing and planning activities in the second half of 2025*."

2) Defendant Xie echoed these statements adding that "*most of the customers probably still one year's away. So they still have some time to evaluate*."

113. The statements set forth above in ¶¶111-12 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein, Defendants' statements about the timing and cadence on which the 2025-26 refresh would be completed were materially false and misleading because, in reality, Defendants knew or recklessly disregarded that the refresh was moving ahead of schedule and would not provide the benefits over a two-year period that Defendants touted. On the last day of the Class Period, shortly after telling investors that the majority of the refresh was still ahead, Defendants stunned investors with the news that it was already 40-50% complete. Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

**B.    Defendants' Materially False And Misleading Statements And Omissions Concerning The Factual Basis For Their Statements Touting The Refresh**

114.    Throughout the Class Period Defendants repeatedly told investors that their ability to quantify the refresh opportunity and track its progress was based on their access to and tracking of near real-time data.

115.    Defendant Jensen stated that Defendants' quantification of the size and value of the 2025-26 refresh was based on the number of FortiGate units that Defendants saw were "*pinging home*," which was purportedly "*a pretty good indicator that there's life out there*," or was "haircut" or discounted for "things that *aren't pinging home.*" Defendant Jensen made these statements, or substantially the same statements, on each of (i) November 19, 2024, during the Needham Virtual Infrastructure, Data Analytics Software & Cloud Communications Conference, and (ii) on December 11, 2024, during the Barclays Global Technology Conference.

116.    On November 19, 2024, during the Needham Virtual Infrastructure, Data Analytics Software & Cloud Communications Conference, Defendant Ohlgart stated that Defendants' quantification of the size and value of the 2025-26 refresh excluded "*regular churn and not active devices and what has refreshed already around it*."

117.    The statements set forth above in ¶¶115-16 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein, Defendants' statements about their ability to track the size and progress of the refresh through live data were materially false and misleading because Defendants knew or recklessly disregarded that their data was *not* "a pretty good indicator" of FortiGate "life," and that their data quantifying the refresh opportunities was inaccurate and that they did not have meaningful insight into the devices that were eligible for refresh at any point during the Class Period. As set forth herein, former employees reported that the Company's Salesforce system was filled with refresh opportunities that did not exist, including in cases where customers had already disconnected their firewalls or switched to another provider. Indeed, at the end of the Class Period Ohlgart admitted that while Defendants

have a handle on the units that enterprise customers possess, "where it's harder for us to predict[,]. [a]nd [where] we can only track registration rates and similar [sic] is in the lower end." Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

### C. Defendants' Materially False And Misleading Statements And Omissions Concerning Defendants' Marketing Initiatives Related To The Refresh

118. On Fortinet's February 6, 2025 earnings call, during his prepared remarks, Defendant Jensen stated that:

> The 2026 and 2027 cohorts present a substantial upsell opportunity for SASE, switches, access points and SecOps solutions. To maximize our upgrade and cross-sell potential, we're implementing several initiatives, including *creating sales plays for each customer segment and key vertical*, *expanding our account plans for larger enterprises* to more specifically target the upgrade and expansion opportunities and *collaborating with our channel partners on SMB opportunities, incentive programs, end user data* and developing targeted bundle offerings for these customers.

119. The statements set forth above in ¶118 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. In truth, as reported by former Fortinet employees, Defendants were not creating sales plays to more specifically target upgrade and expansion opportunities off of the refresh, in reality the refresh was a non-event and business as usual.

### D. Defendants' Materially False And Misleading Statements And Omissions Concerning Expansion Of Sales In The Refresh

120. Throughout the Class Period, Defendants touted to investors that, in connection with the refresh, customers were upgrading their devices, expanding sales, and buying more.

121. On May 7, 2025, during Fortinet's first quarter (1Q) earnings call:

1) Defendant Xie stated that "now" as opposed to "10 years ago when they bought the box," customers "*so far … <u>always</u> kind of come back with much bigger planned infrastructure to upgrade than the previous just replacing the old box*."

2) In response to a question about whether customers would buy "the same or fewer [firewalls] than what they had previously," Defendant Ohlgart stated, "we are seeing so far the customers that have [end of service] devices, *the smaller customers are buying more* . . . In the MSE, in the smaller customer cohort, what we see is that they are *buying more than what they had previously*."

3) Defendant Jensen confirmed that customers were "*buying for other use cases at the same time[,] [s]o the deal sizes are getting bigger*."

122.    On June 3, 2025, during the Bank of America Global Tech Conference, in response to a question from an analyst, Defendant Ohlgart stated:

> [W]hen we analyzed the customers that had end of support devices and who purchased in Q1, *they all had purchased more than their end of support devices,* right. So, *we are able to expand and sell more devices, more services, which is what we actually want and what we promised we would do last year when we announced we have a pretty big cohort*.

123.    The statements set forth above in ¶¶121-22 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein, Defendants' statements that customers were actually buying more than their devices that were eligible for refresh were materially false and misleading because, in reality, Defendants knew or recklessly disregarded that customers were consolidating and downgrading their firewalls, thus buying less, or choosing not to purchase new FortiGate firewalls at all. As set forth herein, former employees reported that the sales opportunities that were prepopulated in Salesforce were not real opportunities and that customers were overwhelmingly choosing to downgrade their firewalls or simply keep the old firewalls they had instead of refreshing. Indeed, Defendant Ohlgart admitted on the last day of the Class Period that customers were buying less and that it could have been due

to "excess capacity from prior years." Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

### E. Defendants' Materially False And Misleading Statements And Omissions Concerning The Risks Involved In The Refresh

124. During the Class Period Defendants made false and misleading statements and omissions regarding the risks involved in the refresh, which were presented as merely hypothetical risks when those exact risks had already materialized.

125. On February 21, 2025, Defendants filed a form 10-K with the SEC, which Defendants Ken Xie, Jensen, and Ohlgart all signed and that Ken Xie and Jensen certified. The Form 10-K contained a list of "Risks Related to Our Business and Financial Position," which stated:

> *Our operating results are likely to vary significantly and be unpredictable.*
>
> Our operating results have historically varied from period to period, and we expect that they will continue to do so as a result of a number of factors, many of which are outside of our control or may be difficult to predict, including:
>
> […]
>
> - the purchasing practices and budgeting cycles of our channel partners and end-customers, including the effect of the end of product lifecycles, refresh cycles or price decreases.

126. The Form 10-K also stated:

> *We face intense competition in our market and we <u>may</u> not maintain or improve our competitive position.*
>
> *As our customers refresh the security products bought in prior years*, *they may* seek to consolidate vendors, which *may* result in current customers choosing to purchase products from our competitors on an ongoing basis. Due to budget constraints or economic downturns, organizations *may* be more willing to incrementally add solutions to their existing network security infrastructure from competitors than to replace it with our solutions. These competitive pressures in our market or our failure to compete effectively *may result in* price reductions, fewer customer orders, reduced revenue and gross margins and loss of market share.

127.    The statements set forth above in ¶¶125-26 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. These statements were materially misleading because they presented the identified risks as merely hypothetical risks when those exact risks had already materialized. Indeed, as set forth above, Defendants knew that their sales of upgraded FortiGate units in connection with the 2026 product refresh cycle were already underperforming and showed no signs of improving and that customers were either downgrading or consolidating their firewalls or choosing not to refresh their firewalls at all and, therefore, that Defendants could not capitalize on the refresh cycle. Further and in any event, these statements were materially misleading half-truths that omitted critical qualifying information.

### F.    Defendants' Materially False And Misleading Statements And Omissions That The Refresh Was Large And Occurring Naturally

128.    On December 11, 2024, Defendants Jensen and Michael Xie participated in a Barclays Global Technology Conference. During the call, Barclays Capital Inc. analyst Saket Kalia asked Michael Xie, "as [a] founder of the business, I mean, you've seen so many refresh cycles. What's different about this refresh cycle just from your perspective?" In response, Michael Xie stated, "a refresh happens as *naturally* it needs to occur. And then -- but at some point, it happens in the *bulk* [more] than some other times."

129.    The statements set forth above in ¶128 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, Defendants Michael Xie's statements that the refresh was happening "naturally" and that it was simply happening more "in bulk" than other times were materially false and misleading and omitted material facts. In reality, Defendants knew or recklessly disregarded that (i) the 2025-2026 refresh cohort was not a natural clustering of end-of-life events, and (ii) the refresh was not larger than other past refreshes because customers were not responding by

CONSOLIDATED CLASS ACTION COMPLAINT                                        44
CASE NO. 3:25-cv-08037-AMO

refreshing their hardware but instead were choosing not to refresh at all and to just keep the hardware they had, or they were consolidating and downgrading their firewalls, thus buying less. As set forth herein, former employees reported that there were no real refresh opportunities and that customers were overwhelmingly choosing to keep the old firewalls they had instead of refreshing. Further, Defendant Ken Xie admitted after the Class Period that the 2026 end of service cohort was not organic but was artificially manufactured by Defendants because "suddenly," since there was "no inventory anymore," Defendants "just announce[d] [the firewalls] end of service."

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

130.    Defendants each acted with scienter in that they knew that their public statements set forth above were materially false and misleading when made and omitted material facts necessary to make the statements not misleading. The facts set forth herein, considered collectively, demonstrate a strong inference that Defendants each knew facts making the statements they made materially false and misleading. In conjunction with and in addition to the facts set forth above, which Plaintiffs repeat, incorporate, and reallege as if fully set forth herein, Defendants' knowledge or scienter is further evidenced by the facts summarized below.

131.    *First*, Defendants' knowledge or scienter is confirmed by the fact that they told investors that they were personally tracking and quantifying the progress of the refresh throughout the Class Period. For example, Defendants Jensen and Ohlgart confirmed that they calculated the figures quantifying the size and value of the refresh, including the $400-$450 million revenue figure, by analyzing the number of FortiGate units that were "pinging home." Ohlgart further confirmed that she personally calculated the numbers that Defendants were touting to investors based on information that excluded "regular churn and not active devices and what has refreshed already around it" from the calculus. Defendants further indicated that their calculations were conservative or low-end figures.

132.    Defendants also regularly touted their access to data regarding the specific composition of the refresh opportunity. For example, at the November 18, 2024 Analyst Day, Defendant Ohlgart confirmed that Defendants were closely monitoring the composition of the refresh, stating "the 2026 cohort is about a fourth of all the registered devices . . . that we currently

have," and specifically that "it's such a large number, it's mainly 65% to 70% is the low-end firewalls. We do have some large firewalls, the 1500D, that's also coming end of support, but it's dwarfed in the numbers here." Ohlgart further highlighted that "because it's mostly smaller units . . . [it's] probably around net to Fortinet over the next two years, around $400 million to $450 million in product revenue, if with normal churn and average price."

133.    In addition, Defendants also highlighted their specific analysis of the customers involved in the refresh. For example, on the June 3, 2025 Bank of America Global Tech Conference, Ohlgart stated that "*we analyzed the customers that had end of support devices and who purchased in Q1, they all had purchased more than their end of support devices*." And on the March 4, 2025 Morgan Stanley Technology, Media & Telecom Conference, Ken Xie assured investors that "*we do see* the customer[s] so far we work with *always* kind of come back with much bigger planned infrastructure to upgrade than the previous just replacing the old box."

134.    Defendants also claimed that they had open lines of communication with their customers and channel partners regarding the progress of the refresh. For example, during Fortinet's Q2 2025 earnings call, Defendant Ohlgart stated "*[o]ur focus and open communication regarding the refresh* allow us and our channel partners to have conversations with our customers around both the upgrade and the customer's overall security strategy."

135.    *Second*, Defendants' admissions at the end of—and after—the Class Period have direct bearing on and reveal their knowledge and scienter *during* the Class Period, including because Defendants said they were "not counting on the refresh" and "*never* consider[ed] [the refresh] as kind of the top growth driver." For example, on August 6, 2025, the last day of the Class Period, Defendant Xie (CEO, Chair, and co-Founder) stated "we're not too much counting on the refresh" and that *[e]ven [if] all [of the FortiGates]*" available for the refresh upgraded "*within like one or two years [it would] still not [provide] much business impact*" because it "is a very small percentage" of the business. Further, on September 11, 2025, Defendant Ken Xie admitted *inter alia* that Defendants themselves "*never consider[ed] [the refresh] as kind of the top growth driver*."

136.    *Third*, the inference of scienter is further bolstered by the temporal proximity of Defendants' false and misleading statements and omissions with the revelation of the truth at the end of the Class Period. For example, in mid-June 2025, Defendants told analysts that the Company was only 20% through the refresh. Only a few weeks later, Defendants shocked the market when they revealed that, in truth, *as of June 2025*, Fortinet was *already 40-50% through the refresh cycle*.

137.    *Fourth,* Defendants' suspicious insider stock sales during the Class Period further contribute to the strong inference of scienter. While Defendants were issuing materially false and misleading statements and omissions to investors—but before the truth was revealed to investors:

1) Defendant Ken Xie sold 706,130 shares of his Fortinet common stock at an average price of $99.63, which allowed him to pocket *over $70.5 million* worth of illegal insider trading proceeds. Further, on August 4, 2025, alone—just *two days* before Defendant Ken Xie himself admitted that they had "*over-discuss[ed]*" the refresh and that it would "not [provide] much business impact"—Ken Xie sold 158,486 shares for over *$15.5 million*.

2) Defendant Michael Xie sold *806,926 shares* of his Fortinet common stock at an average price of $99.75, which generated for him illegal insider trading proceeds of *over $79 million*. Michael Xie sold 476,596 of his shares for nearly $47 million on August 4, 2025—only two days before Defendants told investors the refresh was never going to provide much business impact and Fortinet's stock value declined precipitously.

3) Defendant Jensen sold *119,765 shares* of his Fortinet common stock at an average price of $99.68, which generated for him illegal insider trading proceeds of *over $11.5 million*. Jensen sold 78,605 of his shares for nearly $7 million in November 2024 alone, just days after Jensen assured investors that the 2026 refresh "is a little bit more than 2x 2023" and after Ohlgart assured investors the refresh would generate $400-$450 in revenue.

4) Defendant Ohlgart sold *1,274 shares* of her Fortinet common stock at an average price of $101.58, which generated for her illegal insider trading proceeds of *$132,713*. By comparison, Ohlgart sold *zero shares* in the nine months directly preceding the Class Period.

138. *Fifth*, Defendants' compensation packages were heavily stock-based—to the tune of over 90% for Defendant Ken Xie (CEO)—which made them highly motivated to keep Fortinet's stock price high so they could maximize their incentive awards, including valuable stock options, RSUs, and PSUs. Further, Ken Xie, Michael Xie, and Jensen's compensation packages were heavily weighted towards PSUs that depended on Fortinet's stock price performance relative to the S&P 500. As a result, Defendants' inflated compensation payouts for 2024 included thousands of PSUs worth millions of dollars they otherwise would have forfeited but for the alleged fraud.

139. *Sixth*, Defendants had experience tracking the progress of FortiGate refreshes in the recent past and knew how to monitor the progress of customers upgrading their devices that are eligible for a refresh. Throughout the Class Period Defendants compared the 2026 refresh to the 2023 refresh that had just occurred and discussed how they were able to monitor their customers' purchasing activity to gauge the progress of the 2025-26 refresh.

140. Defendants also repeatedly touted the refresh—and portrayed themselves as knowledgeable about the size, value, progress, and composition of the refresh.

141. *Seventh*, the sale of FortiGates is one of the core components of Fortinet's product revenue, which makes up 30-35% of its total revenue. During the class period Defendants stated that the refresh alone would drive total revenue growth of 4%.

142. Defendants also repeatedly stressed that their ability to sell customers FortiGates is essential to their ability to sell their high-margin SASE and SecOps solutions. For example, on the August 6, 2025 earnings call Defendant Ken Xie stated that while "we do see customer expanding beyond the traditional firewall . . . [the] traditional firewall is still the important control point for all this traffic, especially within the enterprise, within the data center."

143. Further, Defendants used their repeated statements touting the size, value, progress, and composition of the refresh to convince investors that Fortinet was experiencing a business turnaround after several quarters of declining FortiGate sales in a post-COVID slump.

144. The core significance of FortiGate sales in capturing the short-term revenue that Defendants touted to investors as well as retaining customers and maintaining the possibility of upselling the high-margin SASE and SecOps solutions further strengthens the already strong inference of Defendants' scienter.

145. *Eighth*, Defendants Ken and Michael Xie, as co-founders and top executive of the Company, set a tone from the top that chilled open communications and even retaliated against those who questioned their decisions. As relayed by FE-1, Ken Xie and Michael Xie would say whatever they wanted, and no one else had any power to shape the message or correct them if they were saying things that were untrue.

146. Employees who questioned those directives were fired in retaliation. For example, FE-1 explained that the Xie Defendants fired a communications person—FE-1's boss—for asking too many questions.

147. *Ninth*, Ken and Michael Xie are the architects and inventors of the FortiGate firewall technology, which gave them unparalleled insight into FortiGate's technical capabilities, and the import and content of the device's communications with Fortinet. Defendants Ken and Michael Xie thus knew that FortiGate devices "ping" home and thereby engage in a recurring and technically sophisticated exchange of identifying and operational data with Fortinet's servers. The recurring communication streams between installed FortiGates and Fortinet, and Defendants' technical mastery of that process, supports an inference of scienter because Fortinet's founders, Defendants Ken and Michael Xie, designed the FortiGate hardware and FortiOS software to provide them with information regarding the current status of the devices. From a business perspective, the frequent interactions between Fortinet and its installed base of FortiGates provided Defendants with precise insight into how many of its devices, and which models of those devices and their remaining life spans, are in use at any given time. *See* § IV.B.

148.    ***Tenth,*** Defendants evaded analysts' questions regarding the abrupt change in the refresh math and discontinued discussion of the refresh. For example, when asked directly about the sudden acceleration in the refresh cycle and "why we are not seeing more upside in the numbers this year from the refresh cohort," Ohlgart dodged the questions, stating that the Company's ability to track firewalls that would likely be upgraded varies by customer and that some customers may be consolidating their firewalls. Then, when analysts questioned the cadence of the refresh because they had just been told "intra-quarter" that the refresh was only 20% complete, Ohlgart again evaded the question. Tellingly, Defendants also refused to further discuss the refresh publicly after they had made corrective disclosures revealing their Class Period statements as materially false and misleading statements and/or omissions.

149.    Given the importance of analysts' questions, that analysts had repeatedly asked questions about the refresh throughout the Class Period, and that their questions were directly aimed at clarifying Defendants' Class Period misstatements, Defendants' refusal to answer the questions, explain the sudden change in the refresh data, and subsequent refusal to discuss the refresh altogether, support the strong inference of scienter.

## VIII.    LOSS CAUSATION

150.    Defendants' materially false and misleading statements and omissions artificially inflated and/or maintained the price of Fortinet's common stock. The artificial inflation in Fortinet's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market and/or materialized. The information was disclosed to the market on August 6, 2025. This disclosure reduced the amount of inflation in the price of Fortinet's publicly traded common stock, causing economic injury to Plaintiffs and other members of the Class.

151.    As also alleged in detail *supra* in ¶¶80-81, 86, 89-92 (which allegations are expressly incorporated herein), on August 6, 2025, during the Company's Q2 2025 earnings call, Defendants disclosed that the size, timing, and composition of the refresh differed materially from their prior representations and that instead of being 20% complete, the refresh, in both units and dollars, was 40% to 50% complete. Specifically, Ohlgart revealed that: "We estimate that we are

approximately *40% to 50% of the way through the 2026 upgrade cycle* at the end of the second quarter based on the remaining active units and service contracts."

152.    Moreover, Defendant Ken Xie admitted that "*we probably a little bit over-discuss about this refresh upgrade [sic],*" stated that "*we're not counting on the refresh*" and that even if all of the FortiGates eligible for refresh were upgraded, "*it would still not provide much business impact*" because it "*is a very small percentage*" of the business. Ohlgart also admitted that customers had been purchasing less than their previous FortiGates that were up for refresh all along. Ohlgart further stated that "there could be some *excess capacity from prior years that has been replaced or that is replacing some of the EOS models*."

153.    These admissions directly contradicted Defendants' earlier representations that the refresh was only 20% complete, represented 25% of all installed, registered, and pinging home firewalls across the Company's user base, and that "all" customers, both Enterprise and "small," were not just replacing equipment in a like-for-like manner but were instead buying *more*.

154.    The market reaction to Defendants' disclosures was swift and severe. Analysts were shocked. For example, Stephens reported "Fortinet surprised the Street by disclosing that it estimated that it was 40% to 50% of the way through the 2026 upgrade cohort based on the remaining active units and service contracts. . . . We believe the one word to describe the reaction to the disclosure by Fortinet is <u>*shocking*</u>. *We didn't expect this, and we don't think anyone else did*. We note that after hours Fortinet shares were down 3% but *when this disclosure was made declines accelerated with the stock down 17% after hours*. What Changed? We expect this to be the top question from investors. . . . In summary, the key issue and surprise is that refresh has been a material driver of product revenue growth for *the last three to four quarters* and we are 40% to 50% through the most significant component of the expected refresh."

155.    Bernstein, as well as numerous other analysts, also called out Defendants for claiming the refresh was only 20% completed in June, reporting that "[p]reviously, the company communicated being 20% into the refresh cycle after Q1, but *they acknowledged that figure was inaccurate*. When questioned about what the 40-50% progress in refresh cycle refers to, the company clarified that this figure applies both in dollars and units." Oppenheimer explicitly called

out the inconsistency between Defendants' disclosure and their prior statements, noting that "[m]anagement's messaging for 'not negative' ex-refresh product growth *appears incongruent* with prior ~20% refresh progress value/volume and new 40-50% value/volume progress comments."

156. As a result of Defendants' disclosures, Fortinet's common stock price plummeted, nosediving over 22%, from a closing price of $96.58 per share on August 6, 2025 to close at $75.30 per share on August 7, 2025, on unusually high trading volume. This precipitous decline wiped out $16 billion in shareholder value in a single day, the largest such decline in the Company's history.

157. As a result of their purchase or acquisition of Fortinet common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' misstatements and omissions were the proximate cause of the stock price decline and the losses suffered by Class members. Defendants' materially false and misleading statements caused Fortinet common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $114.57 per share on February 19, 2025.

158. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Fortinet's business and prospects. As true facts about the Company were revealed to the market, the price of Fortinet common stock fell significantly. This decline removed the inflation from the price of Fortinet common stock, causing real economic loss to investors who had purchased Fortinet common stock during the Class Period.

159. The decline in the price of Fortinet common stock after the corrective disclosure came to light was a direct result of Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market. The timing and magnitude of the price decline in Fortinet's common stock and analyst shock at Defendants' specific disclosures concerning the 2025-26 refresh negates any inference that the losses suffered by Plaintiffs and the other Class members were caused by other factors such as changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

160. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of

Fortinet common stock and the subsequent significant decline in the value of Fortinet common stock when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed.

## IX.    PRESUMPTION OF RELIANCE

161.    The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Fortinet's common stock was efficient for the following reasons, among others:

a.  Fortinet's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.  Fortinet common stock traded at high weekly volumes;

c.  As a regulated issuer, Fortinet filed periodic reports with the SEC;

d.  Fortinet was eligible to file registration statements with the SEC on Form S-3;

e.  Fortinet regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

f.  Fortinet was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. These reports were publicly available and entered the public marketplace;

g.  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Fortinet common stock; and

h.  Lacking any knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the class purchased or acquired Fortinet common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

162.    As a result of the foregoing, the market for Fortinet's common stock reasonably promptly digested current information regarding Fortinet from all publicly available sources and reflected such information in the price of Fortinet's common stock. All purchasers of Fortinet common stock during the Class Period suffered similar injury through their purchase of Fortinet common stock at artificially inflated prices, and a presumption of reliance applies.

163.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose their knowledge that the 2025-26 refresh was and would never be a major growth driver because of the undisclosed adverse facts in Defendants' possession—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material, *i.e.*, that a reasonable investor might have considered the omitted facts important in making investment decisions. Given the importance of the Refresh to Fortinet, as set forth above, that requirement is satisfied here.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

164.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to the false and misleading statements set forth herein.

165.    To the extent that any of the materially false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above (*see* Sections IV.B, IV.G, IV.I, V, VI *supra*), then-existing facts known to Defendants contradicted their statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by

Defendants was insufficient to insulate Defendants from liability for their materially untrue and misleading statements.

166.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and the statement was authorized or approved by an executive officer of Fortinet who knew that the statement was false or misleading when made.

## XI.    CLASS ACTION ALLEGATIONS

167.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Fortinet's common stock from November 8, 2024 through August 6, 2025, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company during the Class Period, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

168.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fortinet common stock was actively traded on the NASDAQ. As stated in the Company's 2025 proxy materials, there were 764,712,591 shares of Fortinet common stock outstanding as of April 25, 2025. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members of the Class. Class members who purchased Fortinet common stock may be identified from records maintained by Fortinet or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

169. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

170. Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Plaintiffs have no interests that conflict with the interest of the Class.

171. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    a. Whether Defendants' material misrepresentations and omissions as alleged herein misled investors;

    b. Whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

    c. Whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

    d. Whether the Insider Trading Defendants are personally liable for selling their Fortinet stock while in possession of material non-public information;

    e. Whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss;

    f. Whether the members of the Class have sustained damages; and

    g. What is the proper measure of damage suffered by members of the Class.

172. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
(Against All Defendants)**

173.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

174.    This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.l0b-5.

175.    During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew, or were reckless in not knowing, were false or misleading in that they contained misrepresentations and/or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

176.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Fortinet common stock at artificially inflated prices.

177.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fortinet securities.

178.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which

CONSOLIDATED CLASS ACTION COMPLAINT                                              57
CASE NO. 3:25-cv-08037-AMO

they were made, not misleading; made the above statements intentionally or with recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Fortinet common stock, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, the health and sustainability of the Company's hardware sales; (b) artificially inflate and maintain the market price of Fortinet common stock; and (c) cause Plaintiffs and other members of the Class to purchase Fortinet common stock at artificially inflated prices and suffer losses when the true facts became known and/or the risks materialized.

179. Fortinet and the Executive Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

180. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Fortinet stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

181. Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Fortinet securities, which inflation was removed from its price when the relevant truth concealed by Defendants' misrepresentations and omissions became known.

182. Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Fortinet common stock and that the ultimate disclosure of relevant truth concealed by Defendants' misrepresentations and omissions, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Fortinet common stock to decline.

183.   Accordingly, as a result of their purchases of Fortinet securities during the Class Period, Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

184.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule l0b-5, promulgated thereunder.

185.   This claim is brought within the applicable statute of limitations.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### (Against the Executive Defendants)

186.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

187.   During the Class Period, the Executive Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Fortinet's misstatements and omissions as alleged herein.

188.   As officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Fortinet which had become materially false or misleading.

189.   Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Fortinet disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause Fortinet to engage in the wrongful acts complained of herein. The Executive Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Fortinet's common stock.

190.   Each of the Executive Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company,

each of the Executive Defendants had the power to direct the actions of, and exercised the same to cause Fortinet to engage in the unlawful acts and conduct complained of herein. Each of the Executive Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

191.    By reason of the above conduct, the Executive Defendants and/or Fortinet are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT III**
**For Violations of Section 20A of the Exchange Act**
**(Against the Insider Trading Defendants)**

192.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

193.    This count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 on behalf of Plaintiffs and all other members of the Class who purchased shares of Fortinet common stock contemporaneously with the sale of Fortinet common stock by Defendants Ken Xie, Michael Xie, Jensen, Ohlgart (the "Insider Trading Defendants") while the Insider Trading Defendants were in possession of material, nonpublic adverse information as alleged herein, including concerning the size, composition, and timing of the refresh during the Class Period, that rendered their refresh projections not possible and their factual statements concerning the refresh materially false and misleading.

194.    Section 20A of the Exchange Act provides that:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

195.    As set forth herein, the Insider Trading Defendants violated §10(b) of the Exchange Act, Rule 10b-5 and §20(a) of the Exchange Act for the reasons set forth in Counts I and II above.

Additionally, the Insider Trading Defendants further violated §10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling shares of Fortinet common stock while in possession of material, nonpublic adverse information concerning the size, composition, and timing of the 2025-26 refresh, which information they had a duty to disclose, and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

196.    The Insider Trading Defendants sold their Fortinet stock on a national securities exchange and in an open and efficient market, while in possession of material, nonpublic adverse information they had a duty to disclose, but failed to disclose, including information concerning the size, composition, and timing of the 2025-26 refresh. The Insider Trading Defendants' sales of Fortinet stock were contemporaneous with purchases by Plaintiffs.

197.    Contemporaneous with the Insider Trading Defendants' insider sales of Fortinet common stock listed in the tables below, Named Plaintiff purchased Fortinet common stock on December 20 and 26, 2024, on a national securities exchange and in an open and efficient market, while Defendant Ken Xie was in possession of material, nonpublic adverse information he had a duty to disclose, but failed to disclose, including information concerning the size, composition, and timing of the 2025-26 refresh.

198.    Contemporaneous with the Insider Trading Defendants' insider sales of Fortinet common stock listed in the tables below, Lead Plaintiff purchased Fortinet common stock on February 14, 18-20, and 24-27, 2025 and on March 11-13 and 20, 2025, on a national securities exchange and in an open and efficient market, while Defendant Ken Xie, Michael Xie and Jensen were in possession of material, nonpublic adverse information they had a duty to disclose, but failed to disclose, including information concerning the value, size, and pace of the 2025-26 refresh.

| Insider | Sale Date | Shares | Price | Value |
|---------|-----------|--------|-------|-------|
| Jensen Keith F | 11/08/2024 | 39,421 | $85.00 | $3,350,864 |
| Jensen Keith F | 11/08/2024 | 13,504 | $85.98 | $1,161,112 |

| Jensen Keith F | 11/08/2024 | 3,780 | $86.91 | $328,514 |
|---|---|---|---|---|
| Jensen Keith F | 11/19/2024 | 2,650 | $90.53 | $239,897 |
| Jensen Keith F | 11/19/2024 | 1,600 | $91.32 | $146,116 |
| Jensen Keith F | 11/26/2024 | 9,983 | $95.65 | $954,874 |
| Jensen Keith F | 11/26/2024 | 4,076 | $94.97 | $387,105 |
| Jensen Keith F | 11/26/2024 | 3,591 | $96.45 | $346,357 |
| Jensen Keith F | 02/19/2025 | 9,864 | $114.37 | $1,128,118 |
| Jensen Keith F | 02/19/2025 | 7,200 | $112.43 | $809,509 |
| Jensen Keith F | 02/19/2025 | 6,436 | $113.57 | $730,936 |
| Jensen Keith F | 02/26/2025 | 8,663 | $108.84 | $942,870 |
| Jensen Keith F | 02/26/2025 | 8,142 | $109.44 | $891,054 |
| Jensen Keith F | 02/26/2025 | 855 | $110.11 | $94,140 |
| TOTAL | | **119,765** | | **$11,511,466** |

| Insider | Sale Date | Shares | Price | Value |
|---|---|---|---|---|
| Xie Ken | 11/12/2024 | 18,807 | $98.65 | $1,855,386 |
| Xie Ken | 11/12/2024 | 3,731 | $97.91 | $365,316 |
| Xie Ken | 11/12/2024 | 400 | $99.32 | $39,726 |
| Xie Ken | 11/13/2024 | 10,145 | $98.15 | $995,684 |
| Xie Ken | 11/13/2024 | 7,538 | $100.13 | $754,796 |
| Xie Ken | 11/13/2024 | 5,213 | $99.14 | $516,842 |
| Xie Ken | 12/17/2024 | 14,416 | $97.57 | $1,406,601 |
| Xie Ken | 12/17/2024 | 7,700 | $98.46 | $758,174 |
| Xie Ken | 12/17/2024 | 800 | $99.21 | $79,367 |
| Xie Ken | 12/18/2024 | 6,144 | $95.58 | $587,273 |
| Xie Ken | 12/18/2024 | 5,300 | $96.33 | $510,534 |
| Xie Ken | 12/18/2024 | 4,621 | $93.53 | $432,189 |
| Xie Ken | 12/18/2024 | 3,552 | $94.44 | $335,451 |
| Xie Ken | 12/18/2024 | 2,911 | $97.59 | $284,076 |

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-08037-AMO

62

| Xie Ken | 12/18/2024 | 400 | $98.31 | $39,325 |
|---|---|---|---|---|
| Xie Ken | 01/14/2025 | 13,302 | $92.53 | $1,230,851 |
| Xie Ken | 01/14/2025 | 9,711 | $91.90 | $892,482 |
| Xie Ken | 01/15/2025 | 22,344 | $93.30 | $2,084,715 |
| Xie Ken | 01/15/2025 | 700 | $93.92 | $65,745 |
| Xie Ken | 02/11/2025 | 16,357 | $108.54 | $1,775,332 |
| Xie Ken | 02/11/2025 | 6,243 | $109.30 | $682,369 |
| Xie Ken | 02/11/2025 | 100 | $109.99 | $10,999 |
| Xie Ken | 02/12/2025 | 8,534 | $107.20 | $914,852 |
| Xie Ken | 02/12/2025 | 7,520 | $106.09 | $797,816 |
| Xie Ken | 02/12/2025 | 3,367 | $107.65 | $362,458 |
| Xie Ken | 02/12/2025 | 3,300 | $105.22 | $347,241 |
| Xie Ken | 03/10/2025 | 93,941 | $96.29 | $9,045,494 |
| Xie Ken | 03/10/2025 | 79,479 | $97.05 | $7,713,707 |
| Xie Ken | 03/10/2025 | 23,597 | $98.30 | $2,319,694 |
| Xie Ken | 03/10/2025 | 8,983 | $98.97 | $889,041 |
| Xie Ken | 05/02/2025 | 120,952 | $106.24 | $12,849,432 |
| Xie Ken | 05/02/2025 | 37,536 | $105.64 | $3,965,367 |
| Xie Ken | 08/04/2025 | 129,209 | $98.44 | $12,719,114 |
| Xie Ken | 08/04/2025 | 24,377 | $98.94 | $2,411,746 |
| Xie Ken | 08/04/2025 | 4,900 | $97.35 | $477,031 |
| TOTAL | | **706,130** | | **$70,516,227** |

| Insider | Sale Date | Shares | Price | Value |
|---|---|---|---|---|
| Xie Michael | 03/11/2025 | 151,842 | $98.26 | $14,920,283 |
| Xie Michael | 03/11/2025 | 92,915 | $97.34 | $9,044,448 |
| Xie Michael | 03/11/2025 | 69,914 | $99.30 | $6,942,530 |
| Xie Michael | 03/11/2025 | 9,913 | $96.11 | $952,689 |
| Xie Michael | 03/11/2025 | 2,200 | $99.80 | $219,566 |

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-08037-AMO

63

| | | | | |
|---|---|---|---|---|
| Xie Michael | 05/02/2025 | 2,780 | $106.24 | $295,341 |
| Xie Michael | 05/02/2025 | 766 | $105.66 | $80,932 |
| Xie Michael | 08/04/2025 | 387,223 | $98.43 | $38,116,257 |
| Xie Michael | 08/04/2025 | 75,273 | $98.93 | $7,446,570 |
| Xie Michael | 08/04/2025 | 14,100 | $97.39 | $1,373,216 |
| TOTAL | | **806,926** | | **$79,391,833** |

| Insider | Sale Date | Shares | Price | Value |
|---|---|---|---|---|
| Ohlgart Christiane | 6/6/2025 | 1,164 | $104.71 | $121,883 |
| Ohlgart Christiane | 8/5/2025 | 110 | $98.45 | $10,830 |
| TOTAL | | **1,274** | | **$132,713** |

199. Other Class members also purchased shares of Fortinet common stock contemporaneously with the Insider Trading Defendants insider sales of Fortinet common stock identified in the preceding tables.

200. Plaintiffs and other Class members have been damaged as a result of the violations of the Exchange Act alleged herein.

201. By reason of the violations of the Exchange Act alleged herein, the Insider Trading Defendants are liable to Plaintiffs and other members of the Class who purchased shares of Fortinet common stock contemporaneously with the Insider Trading Defendants' insider sale of Fortinet common stock during the Class Period.

202. Plaintiffs and other members of the Class who purchased contemporaneously with the Insider Trading Defendants' insider sales of Fortinet securities seek disgorgement by the Insider Trading Defendants of profits gained or losses avoided from their transactions in Fortinet common stock contemporaneous with Plaintiffs and the other members of the Class.

203. This action was brought within five years after the date of the last transaction that is the subject of the Insider Trading Defendants' violations of Section 20A, and, with respect to the underlying violations of the Exchange Act alleged in this Count and in Counts I and II above,

was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by the Insider Trading Defendants.

## XIII.   PRAYER FOR RELIEF

204.   **WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a) Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, and certifying Plaintiffs as the Class representatives;

b) Awarding compensatory damages in favor of Plaintiffs and other Class members against Defendants, jointly and severally, for all damage sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

c) Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees and other costs; and

d) Awarding such equitable or other further relief as this Court may deem just and proper.

## XIV.   JURY DEMAND

205.   Plaintiffs hereby demand a trial by jury.

Dated:  April 24, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

-and-

JEREMY ROBINSON (*pro hac vice*)
(jeremy@blbglaw.com)
ALEC COQUIN (*pro hac vice*)
(alec.coquin@blbglaw.com)
KELLY D. HOGAN (*pro hac vice*)
(kelly.hogan@blbglaw.com)
1251 Avenue of the Americas

New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff Union Asset*
*Management Holding AG and Lead Counsel*
*for the Class*

**BLEICHMAR FONTI & AULD LLP**

JAVIER BLEICHMAR (pro hac vice forthcoming)
(jbleichmar@bfalaw.com)
300 Park Avenue, Suite 1301
New York, New York 10022
Tel: (212) 789-1340
Fax: (212) 205-3960

-and-

NANCY A. KULESA (pro hac vice forthcoming)
(nkulesa@bfalaw.com)
ROSS SHIKOWITZ (pro hac vice forthcoming)
(rshikowitz@bfalaw.com)
75 Virginia Road
White Plains, New York 10603
Tel: (914) 265-2991
Fax: (212) 205-3960

*Counsel for Named Plaintiff Police & Fire*
*Retirement System of the City of Detroit*